**BOARD OF EDUCATION OF OAK PARK & RIVER FOREST HIGH SCHOOL DISTRICT NUMBER 200, Plaintiff,**

v.

**ILLINOIS STATE BOARD OF EDUCATION and Kelly E., By and Through Her Parent and Next Friend, Nancy E., Defendants.**

No. 98 C 2390.

United States District Court,
N.D. Illinois,
Eastern Division.

Oct. 15, 1998.

## MEMORANDUM OPINION AND ORDER

MORTON DENLOW, United States Magistrate Judge.

This case presents the issue of who should bear the cost of educating a troubled high school student when her parents decide to unilaterally transfer her from her public high school, where she is failing, to a private residential school, where she finds success. The parents say the school district should pay. The school district says the parents or the State Board of Education should pay. The State Board of Education says the school district should pay. The Court holds that all parties share legal responsibility for this regrettable situation and they must all pay.

Plaintiff Board of Education of Oak Park & River Forest High School District Number 200 ("the School District") filed a two-count complaint under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq.,[1] against Defendants Kelly E. ("Kelly"), by and through her parent and next friend, Nancy E., (the "Mother") and the Illinois State Board of Education ("ISBE"). In Count I, the School District appeals a Level II administrative Review Officer's decision requiring the School District to reimburse Kelly's parents for all costs incurred to educate Kelly at Eagle Hill School in Massachusetts. Presently before the Court is the School District's motion for summary judgment against Kelly and her mother challenging the review officer's decision. Kelly and her mother present the Court with a cross motion for summary judgment to affirm the decision. In Count II, the School District requests that, in the event it is found liable to Kelly's parents, the ISBE pay all amounts for which the School District is found liable. The School District has filed a separate motion for summary judgment against the ISBE requesting this relief.

John A. Relias, Franczek Sullivan P.C., Chicago, Illinois, for plaintiff.

Matthew D. Cohen, Cynthia M. Masbaum, Monahan & Cohen, Chicago, Illinois, for defendants Kelly E. and Nancy E.

Courtnay C. O'Connell, Assistant Attorney General, General Law Bureau, Chicago, Illinois, for defendant Illinois State Board of Education.

1. The IDEA was completely revised by Congress in 1997. See Individuals with Disabilities Education Act Amendments of 1997, Pub.L. No. 105–17, 11 Stat. 37 (codified as amended at 20 U.S.C. § 1400 et seq. (1998)). Although the events giving rise to this action occurred both before and after the enactment of these amendments, the Court has determined that the amendments do not affect the outcome of this decision because the effective date of the applicable sections of the IDEA is July 1, 1998.

For the following reasons, the Court grants in part and denies in part the School District's motion for summary judgment against Kelly and her mother and grants in part and denies in part Kelly and her mother's cross motion for summary judgment against the School District. The Court grants in part and denies in part the School District's motion for summary judgment against the ISBE.

## I. STANDARD OF DECISION

■ The first issue which the Court must address is the standard to be applied in deciding this case. Although the parties have filed motions for summary judgment, the Court's standard of decision is not the traditional summary judgment standard. *Morton Community Unit Sch. Dist. No. 709 v. J.M.*, 152 F.3d 583, 587–88 (7th Cir.1998). The IDEA dictates that "the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2). Here, when neither party has requested the Court to hear additional evidence, the "motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record." *Heather S. v. Wisconsin*, 125 F.3d 1045, 1052 (7th Cir.1997). Even though the motion is termed as one for summary judgment, this Court's decision must be based on the preponderance of the evidence. *See Heather S.*, 125 F.3d at 1052; 20 U.S.C. § 1415(e)(2). "The party challenging the outcome of the state administrative decision bears the burden of proof." *Heather S.*, 125 F.3d at 1052.

■ In reviewing the administrative record, the court "is required to give 'due weight' to the results of the administrative proceedings." *Id.* at 1052–53. Reviewing courts must not "substitute their own notions of sound educational policy for those of the school authorities which they review."

*Board of Educ. v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982). "[T]he 'due weight' which the court must give to the hearings below is not to the testimony of witnesses or to the evidence—both of which the court must independently evaluate—but to the decisions of the hearing officers." *Heather S.*, 125 F.3d at 1053. "Due weight" implies "some sort of deference" to the agency's decision, and thus to the decisions of the hearing officers. *Id.* When the decisions of the hearing officers conflict, the Seventh Circuit requires that deference be given to the final administrative decision, in this case, the Level II Review Officer's decision. *Id.* Perhaps the best way to conceptualize the Court's task is to view it as a bench trial on the papers. *Tripp v. May*, 189 F.2d 198, 200 (7th Cir.1951) (holding that it is proper for trial court to decide factual issues and to enter judgment when facts have been fully developed by papers on cross motions for summary judgment).

> [W]hen the court is ruling on cross-motions, the facts sometimes become fully developed at the hearing on the motions. When this occurs in a non-jury case, the court may proceed to decide the factual issues and render a judgment on the merits without any further delay if it is clear that there is nothing else to be offered by the parties and there is no prejudice in proceeding in this fashion. As a practical matter, of course, this procedure amounts to a trial of the action and technically is not a disposition by summary judgment.

10A Charles Alan Wright et al., *Federal Practice and Procedure* § 2720 (3d ed.1998). Because the Court is required to apply a preponderance of the evidence standard while giving "due weight" to the results of the administrative proceedings, the Court will treat this case as a bench trial on the papers.[2]

## II. FINDINGS OF FACT

The following represents the Court's findings of fact based on a preponderance of the

2. The use of the summary judgment procedures under Local General Rules 12M and 12N did not serve to facilitate the resolution of this case because those rules are intended to assist the Court in determining whether material questions of fact exist. In the future, this Court will require parties to submit proposed findings of fact, with citations to the record, and proposed conclusions of law.

evidence standard after giving due weight to the decisions of the Hearing and Review Officers. Additional findings will also be found in later portions of this decision.

## A. The Parties

Kelly is an eighteen-year-old female student who has an extensive history of behavioral and academic difficulties, beginning in the third grade. (Defs.' Local Rule 12(M) Statement of Material Facts ("Defs.' 12(M)") ¶¶ 1, 24–25.) Kelly resides within the boundaries of the School District. The School District is responsible for the education, in compliance with state and federal law, of all student residents in the district. The ISBE is the state educational agency and is ultimately responsible for seeing that all of its constituent school districts are in compliance with the IDEA.

## B. Kelly's Special Education Experiences Prior to Enrollment in Plaintiff School District

On February 1, 1994, in Kelly's eighth-grade year, the student services team at her junior high school requested a case study evaluation to determine whether she was eligible for special education. (Defs.' 12(M) ¶¶ 28, 30; A.R. at 638.) Academic achievement testing indicated that Kelly was performing at a 5.0 grade level equivalency level in reading, a 5.8 grade equivalency level in mathematics, a 4.6 grade equivalency level in written language, a 4.7 grade equivalency level in letter-word identification (decoding words), and a 3.3 grade equivalency level in dictation (spelling), (Defs.' 12(M) ¶¶ 31–32; A.R. at 645); however, Kelly did perform at a 10.0 grade equivalency level in writing samples. (Pl.'s Local Rule 12(N) Response to Defs.' Rule 12(M) Statement of Material Facts ("Pl.'s 12(N)") ¶ 32; A.R. at 732.) Kel-

ly became eligible for special education and related services pursuant to the IDEA on March 15, 1994, under the category of behavior disorder ("BD").[3] (Defs.' 12(M) ¶ 36; A.R. at 668–69.) At the Multi–Disciplinary Conference ("MDC") held on March 15, 1994, school personnel developed an Individual Education Plan ("IEP") for Kelly.[4] (A.R. at 671–73.) The IEP contained the following goals:

(1) To complete assignments on time and turn them into teacher;

(2) To monitor attendance and tardiness;

(3) To decrease resistance to academic assistance;

(4) To increase appropriate strategies to change her attitude toward learning;

(5) To increase on task behavior;

(6) To increase self-confidence and self-esteem.

(A.R. at 672.)

On May 9, 1994, an MDC/IEP meeting took place attended by personnel from the junior high school and Kelly's then future high school, Oak Park River Forest High School ("Oak Park"). (Defs.' 12(M) ¶ 38.) The IEP developed by Oak Park personnel identified Kelly as BD and placed her in a BD resource room and BD social seminar. (Pl.'s Local Rule 12(M) Statement of Material Undisputed Facts ("Pl.'s 12(M)") ¶ 8.) The goals identified were similar to those contained in the prior IEP:

(1) Improve her study and organizational skills;

(2) Arrive on time and remain in classes;

(3) Remain "on task" in class (focus);

(4) Utilize appropriate school resources (request help);

(5) Improve her self-esteem; and

---

**3.** Earlier in this litigation, Kelly stated that she has been eligible for special education since May 9, 1994. (Kelly's Mot. for Statutory Inj. to Enforce the Level II Review Officer's Decision ¶ 2, citing the Level I Hearing Officer's Decision at 3.) This Court set forth this fact in its Memorandum Opinion and Order, dated July 9, 1998, granting Kelly's Motion for Statutory Injunction. May 9, 1994, is the first date that the School District's representatives became involved with Kelly. March 15, 1994, is the first date that Kelly became eligible for special education services from her junior high school.

**4.** Another IEP was developed for Kelly during an IEP conference held on April 19, 1994, that changed her placement from Behavior Disorder Consultation to Behavior Disorder Resource and provided for one period of direct service B/D resource. (A.R. at 664–67.) The annual goals set forth in the April IEP were identical to those found in the March IEP. (A.R. at 664–67; A.R. at 671–73.) The April IEP was not signed by Kelly's parent, but school personnel made the representation that Kelly's parent was in agreement with the change of placement. (A.R. at 667.)

(6) Complete assignments on time (home-work).

(Defs.' 12(M) ¶ 40; A.R. at 648.) The IEP developed by Oak Park for Kelly did not provide for annual goals for her reading difficulties. (Defs.' 12(M) ¶ 49; Pl.'s 12(N) ¶ 49.)

## C. Kelly's Special Education Experiences While Attending Plaintiff School District

### 1. The 1994/95 School Year

Kelly entered Oak Park at the beginning of the 1994/95 school year. (Pl.'s 12(M) ¶ 7.) During her freshman year, Kelly exhibited significant academic and behavioral difficulties, including reading difficulties, repeated truancy, disciplinary infractions, and defiance of school rules. (Defs.' 12(M) ¶ 42.) Kelly was chronically truant from school. (Defs.' 12(M) ¶ 69.) She was absent four days during the first semester and twenty days during the second semester. (Defs.' 12(M) ¶ 73.) There were no goals on Kelly's IEP to address her truancy. (Defs.' 12(M) ¶ 74.) Kelly was placed in two remedial reading classes, Essentials of English and Elements of Reading. (Pl.'s 12(M) ¶ 8.) These classes were not special education classes. (Defs.' Local Rule 12(N) Response to Plaintiff's Rule 12(M) Statement of Material Undisputed Facts ("Defs.' 12(N)") ¶ 8; A.R. at 150.) Kelly failed Essentials of English both semesters of the 1994/95 school year. (Defs.' 12(N) ¶ 8; A.R. at 811.) Kelly received a D for the first semester of Elements of Reading and failed the second semester. (Defs.' 12(N) ¶ 8; A.R. at 811.)

Kelly's mother was in frequent contact with Kelly's dean at Oak Park, Sharon Moyer ("Moyer"), during the 1994/95 school year concerning Kelly's poor school attendance involvement with a negative peer group, her academic performance, and her reading difficulties. (Pl.'s 12(M) ¶ 9.) On January 19, 1995, Kelly's mother called the School District's Behavior Development Program Chairperson, Theresa Brannock ("Brannock"), to request a program change. (Pl.'s 12(M) ¶ 11.) Brannock and Kelly's mother agreed that Kelly's placement should be changed to self-contained for the second semester. (Pl.'s 12(M) ¶ 12.) Although Kelly was moved to the self-contained placement, her IEP was not updated with new goals and

objectives until April 5, 1995. (Defs.' 12(N) ¶¶ 12–13.)

The April 5, 1995, IEP reflected Kelly's change to the more structured self-contained BD class. (Defs.' 12(N) ¶ 13.) English, Algebra, World History, and Social Seminar classes were provided in the self-contained setting. (Pl.'s 12(M) ¶ 14.) Kelly was also placed in a learning disability ("LD") Reading Strategies course and was slated to receive remedial reading services from the School District's reading specialist, Dr. Haywood. (Pl.'s 12(M) ¶ 14.) Kelly refused to take advantage of Dr. Haywood's services. (Defs.' 12(N) ¶ 14.) The IEP also provided for social work services and summer school. (Pl.'s 12(M) ¶ 15.) Kelly's mother approved all changes. (Pl.'s 12(M) ¶ 15.)

As early as January 1995, Kelly's mother requested that Kelly be tested for a possible learning disability. (Defs.' 12(M) ¶ 53.) At the April 5, 1995, MDC/IEP meeting, the MDC team requested that psychological testing be conducted to better assess Kelly's learning difficulties. (Defs.' 12(M) ¶ 54; A.R. at 1221.) The School District's psychologist never conducted the requested psychological testing because she believed that an eighth grade evaluation, indicating the lack of a learning disability, was sufficient. (Defs.' 12(M) ¶ 54; A.R. at 183–84, 1222, 1223–24.) She made this decision to not test Kelly without reconvening an additional MDC/IEP meeting and without written notice to Kelly's mother. (Defs.' 12(M) ¶ 56; Pl.'s 12(N) ¶ 56.)

In her first semester at Oak Park, Kelly received three Ds and three Fs in academic courses and passed her two pass/fail non-academic classes. (Defs.' 12(M) ¶ 86.) In the second semester of her freshman year, Kelly received one D, five Fs, one N (grade and credit withheld for excessive absences), and passed her one pass/fail non-academic class. (Defs.' 12(M) ¶ 87.) She also received a number of detentions and suspensions. (Defs.' 12(M) ¶ 76.)

### 2. The 1995/96 School Year

During the 1995/96 school year, Kelly's sophomore year, Kelly continued to exhibit significant behavioral and academic difficulties. (Pl.'s 12(M) ¶ 16.) She was absent 28

days during the first semester and 46 days during the second semester. (Defs.' 12(M) ¶ 73.)[5] She received numerous detentions and in-school suspensions. (Defs.' 12(M) ¶ 84.) The School District employed regular education attendance and disciplinary policies with Kelly, even though a policy for addressing attendance problems of special education students existed. (Defs.' 12(M) ¶¶ 70, 83.) In the Fall 1995 semester, Kelly received one B (in Reading Strategies), three Fs, and two Is (incompletes) in academic classes, and she passed one of her two pass/fail non-academic classes. (Defs.' 12(M) ¶¶ 88–89.) In the Spring 1996 semester, Kelly either withdrew from or failed all her academic courses and passed three of her six pass/fail non-academic classes. (Defs.' 12(M) ¶ 90; Pl.'s 12(N) ¶ 90.) Thus, by the end of her second year in high school, Kelly had obtained only ten of the expected twenty credits. (Defs.' 12(M) ¶¶ 78–79.)

On March 8, 1996, school personnel held an MDC/IEP conference to plan Kelly's return to school after a period of excessive truancy and a hospital stay. (Pl.'s 12(M) ¶ 23.) Kelly had indicated that she wanted to return to school and participate in a work program. (Pl.'s 12(M) ¶ 23.) Consequently, Kelly began participating in an off-campus work experience program in the mornings and attending self-contained classes in the afternoon. (Pl.'s 12(M) ¶ 24.) Nevertheless, Kelly's attendance and tardiness were still problematic. The IEP also indicated that Kelly was to receive psychological and/or social work related services, but did not indicate the quantity of services to be provided nor whether the services were direct or consultative. (Defs.' 12(M) ¶ 99.)

In March 1996, Kelly's mother again discussed evaluating Kelly for a possible learning disability and signed a consent form to allow the evaluation. (Defs.' 12(M) ¶¶ 57–58; Pl.'s 12(N) ¶ 57.) No one performed the requested evaluation. (Defs.' 12(M) ¶ 58.) The School District states that this was because of the concern over the test-retest effect which can cause inflated scores. (Pl.'s 12(N) ¶ 110.)

In February and March 1997, Kelly's mother obtained independent psychological and learning disabilities evaluations which indicated that Kelly had a specific learning disability that had not been identified by the School District. (Defs.' 12(M) ¶ 61; Pl.'s 12(N) ¶ 61.) Dr. Richard Guerra, a clinical psychologist, tested Kelly and recommended that "further testing be done to determine the nature and extent of a learning disability." (A.R. at 1223.) An educational diagnostician, Mary Ellen Gavin, M.A., found that Kelly had a non-verbal learning disability, a language processing disorder, and moderate to severe dyslexia. (Defs.' 12(M) ¶¶ 64–65.)

## D. Kelly's Out–of–School Behavioral Problems

Kelly continued to demonstrate significant behavioral problems into her sophomore year. During the 1995 Christmas break, Kelly moved out of the house and for a few days her mother did not know her whereabouts. (Pl.'s 12(M) ¶ 17–18.) After a period of time, she began staying with a friend but did not attend school. (Pl.'s 12(M) ¶ 18.) Kelly returned home after becoming ill, but only for two weeks, after which she moved back in with her friend. While living with her friend, Kelly, with a number of older companions reputed to be gang members, was picked up by the Blue Island Police Department for violating a curfew ordinance. (Pl.'s 12(M) ¶ 20.) The police told Kelly to move back home and go back to school. (Pl.'s 12(M) ¶ 21.) Kelly returned home, but brought her problems with her. (Pl.'s 12(M) ¶ 22.) After an upsetting phone call, she tried to take a large kitchen knife to her room. (Pl.'s 12(M) ¶ 22.) Kelly's mother fought with Kelly over the knife and was able to take it away from her. (Pl.'s 12(M) ¶ 22.)

On February 24, 1996, Kelly's mother admitted her to the Hinsdale Hospital Adolescent Psychiatric Inpatient Program. (Pl.'s 12(M) ¶ 23; A.R. at 1222.) Kelly was admitted for " 'out-of-control' and runaway behavior, drug abuse, extreme oppositionality and defiance of home rules, low self-esteem and

---

**5.** Paragraph 73 of Defs.' 12(M) refers to Kelly's absences in the 1995/96 and 1996/97 school years; however, the Court assumes these references to be in error because all other evidence indicates that Kelly attended Oak Park during the 1994/95 and 1995/96 school years.

depression." (A.R. at 1222.) Kelly was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"), Oppositional Defiant Disorder, and Polysubstance Abuse. (Defs.' 12(M) ¶ 97.) This medical diagnosis was provided to the School District at the March 8, 1996, MDC/IEP meeting. (Defs.' 12(M) ¶ 98.) Dr. Bernadino, the psychiatrist who treated Kelly at Hinsdale, prescribed Ritalin to address Kelly's ADHD, but Kelly refused to cooperate in taking the medication until July 1996. (Pl.'s 12(M) ¶ 27.) On May 13, 1996, Kelly was again admitted to Hinsdale Hospital because she had again run away from home. (Pl.'s 12(M) ¶ 25.)

### E. Kelly's Move to Eagle Hill

In September 1996, Kelly's mother unilaterally withdrew Kelly from attendance at Oak Park and placed her at Eagle Hill School, a residential school in Massachusetts, which serves students with learning disabilities, ADHD, and emotional and behavioral difficulties. (A.R. at 1–2.) Eagle Hill School is not an ISBE-approved residential facility. (A.R. at 1–2.) At least one of the Eagle Hill staff members is special education certified and some of the teaching staff are certified in the Orton–Gillingham method of instruction in reading. (Defs.' 12(N) ¶ 30.) Eagle Hill uses an IEP format that includes specific goals, short term objectives, evaluation criteria, and a narrative that discusses the student's progress. (Defs.' 12(M) ¶ 163.) The school day is highly structured. (Defs.' 12(M) ¶ 153.) Class size is small; most classes have only three to seven students while some have a one-to-one student-to-teacher ratio. (Defs.' 12(M) ¶ 158; Pl.'s 12(N) ¶ 169.)

Kelly has benefitted significantly from her placement at Eagle Hill during the 1996/97 school year, the 1997 summer term, and the 1997/98 school year. (Defs.' 12(M) ¶ 143.) Eagle Hill is addressing her reading difficulties through one-to-one instruction following the Orton–Gillingham method of teaching reading and reading comprehension. (Defs.' 12(M) ¶ 171.) While at Eagle Hill, Kelly has passed all of her courses and her attendance has dramatically improved. (Defs.' 12(M) ¶¶ 145, 148.) In a positive reinforcement program in which students earn privileges, she has been consistently earning full privileges. (Defs.' 12(M) ¶ 150.)

## III. DUE PROCESS HEARINGS

### A. Level One Hearing

On March 28, 1997, Kelly's mother filed a request for a special education due process hearing, seeking reimbursement for the cost of Kelly's placement at Eagle Hill and the cost of the independent evaluations. (Defs.' 12(M) ¶ 8.) Impartial Hearing Officer ("IHO") Gregory Waas, Ph.D., conducted the Level I special education due process hearing on October 30, November 20, and December 10, 1997. (Defs.' 12(M) ¶ 9.)

The IHO found that

the preponderance of the evidence indicates that the failure by the District to conduct an evaluation to investigate the presence of a learning disability was a serious oversight that understandably undermined the parents' confidence in the evaluation process and resulted in inconsistent and inadequate programming for [Kelly]'s reading deficits.

(A.R. at 1225.) The IHO went on to find that

[t]he District's response to [Kelly]'s clear and significant reading deficits, however, was much less systematic and must be judged as inadequate.... Given the District's inadequate response to Kelly's reading problems, the parents' decision to seek out independent evaluations and an alternative educational placement must be viewed as reasonable.

(A.R. at 1227.)

The IHO further found that

many of the behavioral problems that led the parents to seek a 24–hour residential placement (e.g., drug/alcohol abuse, runaway behavior, home rule violations, negative peer involvement) took place outside of the school and cannot be viewed as school-related.

(A.R. at 1227.)

The IHO concluded that the Mother was entitled to reimbursement from the School District for "that portion of the Eagle Hill placement that is primarily related to her reading difficulties (i.e., tuition)...." (A.R. at

1228.) However, the IHO concluded that the Mother was "not entitled to reimbursement for the portion of the Eagle Hill program (i.e., room and board) that is devoted to nonschool related behavioral problems." (A.R. at 1228.)

The Level I Decision granted partial relief to Kelly's parents, and ordered the School District to pay for only the educational costs, not room and board, incurred at Eagle Hill, 50 percent of transportation costs, and the costs of two independent evaluations conducted by Mary Ellen Gavin and Dr. Guerra. (A.R. at 1228.)

## B. Level Two Hearing

Both parties appealed the Level I decision. (Defs.' 12(M) ¶¶ 12–13.) Level II Review Officer Julius Menacker conducted the Level II Special Education hearing on March 12, 1998. (Defs.' 12(M) ¶ 15.) He heard no additional testimony. He found that the parties did not disagree regarding the facts developed at the Level I hearing, but rather on the interpretation of the facts as they relate to matters of law. (A.R. at 2.)

> The Level II Review Officer found that the student's problematic behavior at home and school were [sic] intertwined. The evidence clearly indicates that services offered by the school, as disciplinary and truancy responses appropriate for non-disabled students, neglected the student's acknowledged BD condition, as well as the student's probable LD and HDLD conditions. These deficiencies constituted a denial of FAPE, as the student was *not* provided with services allowing her to receive educational benefit in her school placement. I further conclude that the facts and law indicate that residential placement for the student was appropriate.

(A.R. at 10.) The Level II Review Officer also found that the failure of the School District to respond to the MDC recommendation that psychological testing be conducted to better assess Kelly's possible learning disability was not a *de minimis* procedural violation. (A.R. at 10.)

The Level II Decision, issued on March 30, 1998, ordered the School District to pay for only one evaluation, and to reimburse the parents for the full costs, including transportation and room and board, at Eagle Hill from the date of enrollment through the 1998 Summer term. (A.R. at 13.)

## C. Suit Filed in District Court

The School District appealed the Level II decision to this Court on April 17, 1998. (Defs.' 12(M) ¶ 18.) Kelly filed a Motion for Statutory Injunction to Enforce the Level II Review Officer's Decision seeking an order requiring the School District to comply with the Review Officer's decision, and to pay all costs associated with Kelly's placement at Eagle Hill School pending final resolution. This Court granted the statutory injunction. *See Board of Educ. of Oak Park v. Illinois State Bd. of Educ.*, 10 F.Supp.2d 971 (N.D.Ill.1998). Following entry of the injunction, the parties entered a settlement regarding Kelly's placement at Eagle Hill for the 1998/99 school year.

## III. THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT

■ Courts engage in a two step inquiry in suits brought under the IDEA. First, the court asks whether the State has complied with the procedures set forth in the Act. Second, the court asks whether the individualized educational program developed through the Act's procedures is reasonably calculated to enable the child to receive educational benefits. If the state has met both of these requirements then it has complied with the obligations imposed by Congress. *Rowley*, 458 U.S. at 206–07, 102 S.Ct. at 3051.

## A. Purpose of the IDEA

> The purpose of the IDEA is
> to assure that all children with disabilities have available to them ... a free appropriate public education which emphasizes special education and related services designed to meet their unique needs, to assure that the rights of children with disabilities and their parents or guardians are protected, to assist States and localities to provide for the education of all children with disabilities, and to assess and assure the effectiveness of efforts to educate children with disabilities.

20 U.S.C. § 1400(c). "[T]he purpose of the IDEA is to open the door of public education to [disabled] children, not to educate a [disabled] child to her highest potential." *Heather S.*, 125 F.3d at 1054 (internal quotations and citations omitted). To receive financial assistance under the IDEA, states must assure that "a free appropriate public education will be available for all children with disabilities. . . ." and that

> all children residing in the State who are disabled, regardless of the severity of their disability, and who are in need of special education and related services are identified, located, and evaluated, and that a practical method is developed and implemented to determine which children are currently receiving needed special education and related services and which children are not currently receiving needed special education and related services.

20 U.S.C. § 1412(2).

Educators tailor the "free appropriate public education" ("FAPE") required by the Act to the unique needs of the disabled child through an "individualized educational program" ("IEP"). *Rowley*, 458 U.S. at 181, 102 S.Ct. at 3038. The IEP is the "primary vehicle" of the IDEA's implementation. *Honig v. Doe*, 484 U.S. 305, 310, 108 S.Ct. 592, 597, 98 L.Ed.2d 686 (1988). The IEP, mandated for each disabled child, is an educational plan developed specifically for the child by the local school district, the child's teacher, the parents or guardians, and, when appropriate, the child. 20 U.S.C. § 1401(a)(20). "[T]he IEP sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *Honig*, 484 U.S. at 311, 108 S.Ct. at 598. The IEP must be annually reviewed and revised when necessary. 20 U.S.C. § 1414(a)(5). The IEP is the "centerpiece" of the IDEA, and "Congress repeatedly emphasized throughout the Act the importance and indeed the necessity of parental participation in both the development of the IEP and any subsequent assessment of its effectiveness." *Honig*, 484 U.S. at 311, 108 S.Ct. at 598.

## B. Procedural Violations

The Court's first inquiry under *Rowley* is whether the School District has complied with IDEA procedures. *See Rowley*, 458 U.S. at 206, 102 S.Ct. at 3051. "Procedural flaws do not automatically require a finding of a denial of a [free appropriate public education]. However, procedural inadequacies that result in the loss of educational opportunity . . . clearly result in the denial of a [free appropriate public education]." *W.G. v. Board of Trustees*, 960 F.2d 1479, 1484 (9th Cir.1992). Parents are entitled to reimbursement for the cost of a unilateral placement when the school district has violated the IDEA failing to follow the procedures set forth in the Act, which in turn results in a denial of a FAPE. *Board of Educ. of Murphysboro v. Illinois State Bd. of Educ.*, 41 F.3d 1162, 1168 (7th Cir.1994).

Both hearing officers found serious procedural violations which resulted in the loss of educational opportunity and denial of a FAPE. (A.R. at 10–11, 1226–27.) Kelly argues that numerous failures by the School District to adhere to the procedural requirements of the IDEA, some standing alone and certainly when combined, constituted a denial of a FAPE. The procedural violations alleged by Kelly are that: (1) the School District changed Kelly's placement in January 1995 without providing written notice and without convening an MDC/IEP meeting to discuss a plan for Kelly's changed placement in violation of 20 U.S.C. § 1401(20) and 34 C.F.R. § 300.344; (2) the School district failed to adequately consider the diagnosis and recommendations of Dr. Bernadino in violation of 23 Ill.Admin.Code § 226.542; (3) the School District failed to conduct the psychological evaluation requested by the MDC/IEP team at the April 5, 1995, MDC/IEP meeting and further failed to reconvene the MDC/IEP team or provide written notice to inform of its decision not to evaluate Kelly; (4) the School District failed to incorporate into Kelly's IEPs her initial or current levels of performance in violation of 20 U.S.C. § 1401(a)(20)(A) and 34 C.F.R. § 300.346(a), resulting in no baseline by which to assess Kelly's progress; (5) the School District failed to conduct an annual review of Kelly's

progress as mandated by 20 U.S.C. § 1414(a)(5); (6) the goals and short term objectives provided in Kelly's IEPs were vague and meaningless, failing to meet state and federal standards and failing to provide any objective measurement criteria in violation of 34 C.F.R. § 300.346(a)(5); (7) the School District failed to provide short term objectives for some goals in Kelly's IEPs in violation of 34 C.F.R. § 300.346(a)(2); (8) the School District failed to incorporate a behavior management plan in violation of the Illinois School Code and failed to document the behavioral interventions that it used with Kelly; (9) the School District failed to reevaluate Kelly within three years of the prior evaluation in violation of 34 C.F.R. § 300.534(b); and (10) the School District failed to provide an individualized transition plan in the school year in which Kelly reached age fourteen-and-a-half.

The Level II Review Officer did not specifically address each alleged violation. He found the failure by the School District to provide formal notice of Kelly's change in placement in January 1995 was *de minimis* because the parents requested, knew of, and approved the change. (A.R. at 8.) The Review Officer also found that the School District's refusal to test Kelly in the spring of 1996 due to the "test, retest" effect "cannot be held to be a fatal violation of the student's rights under IDEA." (A.R. at 8.) However, the Review Officer concluded that the failure of the School District to respond to the April 5, 1995, MDC recommendation to explore Kelly's possible LD was not *de minimis*. (A.R. at 10.) He also concluded that Kelly's IEP did not indicate appropriate responses to her LD and ADHD disabilities and the School District did not extend appropriate services to her. (A.R. at 10.) The Review Officer indicated that Kelly's continued failure, truancy, class cutting, and disciplinary problems provided evidence that appropriate services were not provided to Kelly. (A.R. at 10.)

The School District argues that the Review Officer's determination that the School District's procedural violations were not *de minimis* is based on an erroneous conclusion that Kelly was denied a FAPE. The School District contends that although it did not conduct an LD evaluation or place Kelly in an LD classroom, these oversights did not result in the loss of educational opportunity so as to deny Kelly a FAPE. The School District relies on the approach taken by the *Heather S.* court when it stated that "the IDEA concerns itself not with labels, but with whether a student is receiving a free and appropriate education." 125 F.3d at 1055. The School District argues that, regardless of whether Kelly's needs were correctly categorized, her needs were in fact being met in a manner reasonably calculated to provide her with some educational benefit: Kelly was placed in remedial reading classes, offered assistance by Dr. Haywood, and placed in the special education LD/BD reading class in her sophomore year.

The Court agrees with the Level II Review Officer that failure by the School District to provide formal notice to the parents of Kelly's change in placement in January 1995 was *de minimis* because the parents requested, knew of, and approved the change. Giving "due weight" to the Review Officer's educational expertise, the Court also upholds his conclusion that the School District's refusal to test Kelly in the spring of 1996 due to the "test, retest" effect was not a fatal violation of Kelly's rights. Finally, the Court agrees with the Review Officer's conclusion that the failure of the School District to explore and respond to Kelly's possible LD was not *de minimis* and resulted in a denial of a FAPE.

The IDEA contemplates a special education designed to meet a disabled child's unique needs and seeks to assure the effectiveness of efforts to educate children with disabilities. *Rowley,* 458 U.S. at 203, 102 S.Ct. at 3049. An appropriate education specific to a disabled child's needs must begin with full recognition of the disability and assessment of its extent. School authorities cannot properly address problems which they do not understand. The School District did not merely mislabel or mischaracterize Kelly's disabilities, it failed to fully evaluate and understand them. Although the School District recognized that she had serious reading difficulties, it did not recognize and address her specific learning disabilities later identified by independent tests or take into ac-

count the effects of her ADHD diagnosis. The failure of the School District to conduct an evaluation to investigate the presence of a learning disability was a serious error and resulted in inconsistent and inadequate programming for Kelly's reading problems.

 Relying on *Springer v. Fairfax County School Board*, 134 F.3d 659, 664 (4th Cir.1998), the School District argues further that the Review Officer's conclusion that Kelly's continued failure and poor conduct provided evidence that she was not receiving appropriate services is misplaced because a student's out-of-school conduct and unwillingness to cooperate does not render an individualized educational program designed for her inappropriate under the IDEA. The *Springer* court refused to equate "bad conduct" with a "serious emotional disturbance" that would bring a child under the ambit of the IDEA. *Id.* The Court finds *Springer* to be distinguishable on its facts. The student in *Springer* had never been identified as disabled by school authorities; numerous psychological reports and other evidence indicated that, although the student was "socially maladjusted," he could not be described as seriously emotionally disturbed; and the state review officer held that the student was not disabled under the IDEA. *Id.* In the instant case, Kelly has been identified by school authorities as BD and eligible for special education services since the eighth grade.

## C. Substantive Inquiry

 The Court's second inquiry under *Rowley* is whether the School District's proposed IEP was "reasonably calculated to enable the child to receive educational benefits." 458 U.S. at 207, 102 S.Ct. at 3051. The issue is whether the School District's proposed placement was appropriate, "not whether another placement would also be appropriate, or even better for that matter." *Heather S.*, 125 F.3d at 1057. The School District is required to provide an appropriate education, "not the best possible education, ... or the placement the parents prefer." *Id.* The School District satisfies its requirements under the IDEA by

> providing personalized instruction with sufficient support services to permit the child to benefit educationally from that

instruction. Such instruction and services must be provided at public expenses, must meet the state's educational standards, must approximate the grade levels used in the state's regular education and must comport with the child's IEP.

*Rowley*, 458 U.S. at 203, 102 S.Ct. at 3049. There is not "any one test for determining the adequacy of educational benefits conferred upon all children covered by the Act." *Id.* at 202, 102 S.Ct. at 3049. The appropriate concern is finding a program which will be of educational benefit to the child. *Board of Educ. of Community Consol. Sch. Dist. No. 21 v. Illinois State Bd. of Educ.*, 938 F.2d 712, 717 (7th Cir.1991).

### 1. The School District's Proposed Placement Was Not Appropriate

In arguing that it fulfilled its requirements to Kelly under the IDEA, the School District relies on the single word "some" from *Rowley*: "[i]mplicit in the congressional purpose of providing access to a 'free appropriate public education' is the requirement that the education to which access is provided be sufficient to confer *some* educational benefit upon the handicapped child." 458 U.S. at 200, 102 S.Ct. at 3048 (emphasis supplied). The School District argues that Kelly received *some* educational benefit while at Oak Park, as evidenced by her participation in the work program and her success in her reading strategies and social seminar classes and that Kelly's failure to obtain greater benefit from her Oak Park placement was due to her own unwillingness to try. The School District's analysis ignores the following statement contained in the same paragraph of *Rowley*. "We therefore conclude that the 'basic floor of opportunity' provided by the Act consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Id.*

 The Court finds that the School District's proposed placement was not appropriate. *Rowley* does not mean that a *de minimis* benefit is sufficient. *See M.C. v. Cent. Regional Sch. Dist.*, 81 F.3d 389, 393 (3d Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 176, 136 L.Ed.2d 116 (1996). Kelly failed

half of all her classes at Oak Park and, except for passing several pass/fail classes and making one B in Reading Strategies I, received Ds in the remaining half. This record demonstrates that the educational benefit that Kelly was receiving was minimal.

The School District failed to show that it properly addressed Kelly's school-related behavioral problems at Oak Park: her class cutting, truancy, and disciplinary problems. Although the Court recognizes that school authorities are hard pressed to force students to attend school, the Court agrees with the Level II Review Officer that the School District's interventions in Kelly's case were insufficient to meet the test set forth in *Rowley* of educational instruction specifically designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction. 458 U.S. at 188–189, 102 S.Ct. at 3042. The record demonstrates that Oak Park's responses to Kelly's behavioral problems did not address Kelly's unique problems. (A.R. at 8.) For instance, the attendance system was "automatically cranking out detentions and automatically cranking out pieces of paper ..." to address Kelly's behavioral problems. (A.R. at 144.)

Furthermore, the Court finds that the School District's response to Kelly's reading difficulties was inadequate. The Level I Hearing Officer found that the School District failed to conduct an appropriate evaluation of Kelly's reading problems and provided Kelly with reading services in an "ad-hoc, somewhat piecemeal" manner. (A.R. at 1227.) The Hearing Officer found that the failure of the School District to achieve a comprehensive understanding of the scope and severity of Kelly's academic difficulties resulted in an inconsistent and fragmented approach to the remediation of Kelly's reading problems. (A.R. at 1224.)

> Although the District did periodically provide [Kelly] with remedial reading classes, no systematic and comprehensive plan to deal with her reading difficulties was ever developed. Such a failure was manifested ... by the absence of any goals or objectives that specifically addressed these reading, deficits, the failure of the school to more aggressively attempt to ensure

that prescribed reading tutoring was in fact delivered, and the failure to assign [Kelly] to a learning disabilities classroom.

(A.R. at 1224.) The Court agrees with the Hearing Officer's assessment of the record. This issue was not specifically addressed by the Level II Review Officer but falls within his general conclusion that Kelly was denied a FAPE. Therefore, the Court concludes that the School District's proposed educational placement for Kelly was not reasonably calculated to enable her to receive educational benefit.

### 2. Educational Placement at Eagle Hill

■ Having found the School District's proposed placement inappropriate, the Court must next address whether Kelly's placement at Eagle Hill was appropriate. *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 15, 114 S.Ct. 361, 366, 126 L.Ed.2d 284 (1993). The Court finds that Eagle Hill School is an appropriate educational placement for Kelly. This finding comports with the conclusions of the Level I Hearing Officer and the Level II Review Officer. At Eagle Hill, Kelly has demonstrated academic progress and has improved her attendance rate. Kelly's reading and reading comprehension is improving. Because the School District's proposed educational placement was inappropriate and Eagle Hill afforded an appropriate educational placement, Kelly's parents are entitled to retroactive reimbursement from the School District for the educational portion of Kelly's placement at Eagle Hill School from the point of enrollment through the 1997/1998 school term. *See School Comm. of Burlington v. Department of Educ.*, 471 U.S. 359, 370–71, 105 S.Ct. 1996, 2003, 85 L.Ed.2d 385 (1985) ("Congress meant to include retroactive reimbursement to parents as an available remedy in a proper case.... Reimbursement merely requires the [school district] to belatedly pay expenses that it should have borne in the first instance had it developed a proper IEP.") The fact that Eagle Hill is not ISBE-approved and did not meet the IDEA definition of a FAPE is not a bar to reimbursement because such requirements do not apply to parental placements. *See Florence County Sch. Dist. v.*

*Carter,* 510 U.S. 7, 14, 114 S.Ct. 361, 365–66, 126 L.Ed.2d 284 (1993). The educational portion of Kelly's placement is the cost of tuition and related educational costs, if any, such as books.

### 3. Residential Placement Was Not Required

■■■ Having found that School district's proposed placement violated IDEA and that the educational placement at Eagle Hill was proper under the Act, the Court is authorized to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2). Under this provision, "equitable considerations are relevant in fashioning relief," *Burlington,* 471 U.S. at 374, 105 S.Ct. at 2005, and this Court enjoys "broad discretion" in fashioning the relief, *Burlington,* 471 U.S. at 369, 105 S.Ct., at 2002. This includes reimbursing parents for the costs of private special education if the court determines that such placement, rather than the proposed IEP, is proper. *Burlington,* 471 U.S. at 369, 105 S.Ct. at 2002. The Court must consider all relevant factors, including the appropriate and reasonable level of reimbursement. The Court is not required to provide total reimbursement if a portion of the cost was not reasonable or necessary. *Florence,* 510 U.S. at 16, 114 S.Ct. at 366.

Regulations provide that an appropriate education may require residential placement:

> If placement in a public or private residential program is necessary to provide special education and related services to a child with a disability, the program, including non-medical care and room and board, must be at no cost to the parents of the child.

34 C.F.R. § 300.302.

■■ The Court must determine whether Kelly's placement "may be considered necessary for educational purposes, or whether the placement is a response to medical, social, or emotional problems that is necessary quite apart from the learning process." *Clovis Unified Sch. Dist. v. California Office of Admin. Hearings,* 903 F.2d 635, 643 (9th Cir.1990). *Clovis* involved a seriously emotionally disturbed child who was entitled to special education and related services and required residential placement in order to receive an appropriate education. *Id.* at 639.

The primary issue before the court was whether hospitalization at an acute care psychiatric facility constituted either a residential placement or a related service, for which the school district was financially responsible, or an excludable medical service. In determining that the school district was not financially responsible for the placement, while the psychiatric hospitalization was perhaps necessary for the child's continued mental health, the *Clovis* court rejected the premise that "where medical, social or emotional problems that require hospitalization create or are intertwined with the educational problem, the states remain responsible for the entire cost of the placement." *Id.* at 643 (internal quotations and citations omitted). The Seventh Circuit appears to agree with this conclusion when it held that in such situations, the Court should defer to the factual decisions of the hearing officer as to whether the service is a "related service." *Morton Comm. Unit Sch. Dist. No. 709 v. J.M.,* 152 F.3d 583, 587.

■■ The Court finds that twenty-four hour residential placement for Kelly was primarily for noneducational reasons. Kelly's residential placement was due to her uncontrolled out-of-school behavior: substance abuse, runaway behavior, defiance of home rules, and involvement with a negative peer group. The Level I Hearing Officer determined that

> [o]ral testimony by both [Kelly]'s parents and Dr. Bernadino (Hinsdale Hospital psychiatrist) indicated that, at the time of her placement at Eagle Hill, [Kelly] needed such 24–hour structure due to her noncompliance with home rules, runaway behavior, polysubstance abuse, and involvement with a negative peer group. The preponderance of evidence indicated that these behaviors took place almost exclusively outside of school.

(A.R. at 1225.) Dr. Bernadino advocated for Kelly's residential placement based primarily on concern about Kelly's uncontrolled behavior:

> [Kelly] could have the greatest placement in the world, but after school hours ... she would still do what she wanted to do. She could still run away.... Unless she is tied

to a post in the house ... until she's ready the next day to go to a therapeutic school, its not going to work.

(A.R. at 522.) In a March 31, 1997, letter, Dr. Bernadino stated:

It is my strong opinion that sending [Kelly] to a residential program with a therapeutic school component was the only alternative that was left in order to help this child. The consequences of not being in a therapeutic school for an extended period of time would include drug and alcohol use, non-compliance with any form of treatment and most likely continued running away and continued defiance of all authority figures and possibly patient getting hurt herself or hurting someone.

(A.R. at 742.) Dr. Bernadino's expressed concerns for Kelly's welfare were valid but nevertheless related to Kelly's life outside of school.

▆▆▆ The Court finds that twenty-four hour residential placement for Kelly was primarily for noneducational reasons. The Level II Review Officer found that Kelly's "problematic behavior at home and school were intertwined" and that residential placement was appropriate. (A.R. at 10.) Indeed, Kelly's problems are complex. However, the Court concurs with the *Clovis* court that a school district does not remain responsible for the entire cost of a placement when that placement was made due to multiple problems that are intertwined with the educational problems. *See Clovis,* 903 F.2d at 643. The Court agrees with the Level I Hearing Officer's assessment that the preponderance of the evidence indicated that Kelly needed a twenty-four hour structure due to behaviors that took place almost exclusively outside of school.

▆▆▆ Although a residential school may be the best place for Kelly considering her problems, it is not required to address her educational needs. Therefore, the School District is not required to reimburse Kelly's parents for the costs associated with her room and board at Eagle Hill or transportation costs to and from Massachusetts. This conclusion is further buttressed by statements from Kelly's counsel during oral argument on these motions, in which counsel acknowledged that the educational structure and programs found at Eagle Hill were also available from private schools in the Chicago area. The Mother's decision to enroll Kelly in Eagle Hill was made not only to find a suitable educational program, but also to remove Kelly from her local friends with whom she was getting into serious trouble and facing possible personal harm and from her home environment where she was in conflict with her family.

### 4. Reimbursement for Independent Evaluations

▆▆▆ Defendants argue that they are entitled to reimbursement for two independent evaluations which they obtained for Kelly at their own expense. These involved both IQ and psychological testing to evaluate Kelly for possible learning disabilities. Defendants argue that they should be reimbursed for the two evaluations because such evaluations were the responsibility of the School District and the Mother obtained the evaluations independently only after the School District failed to do so. The Level II Review Officer concluded that the Defendants were entitled to reimbursement for only one of the two independent evaluations, that is, for the one conducted by Mary Ellen Gavin and not the one conducted by Dr. Guerra. This determination is fully supported by the case law and the regulations. *Board of Educ. of Murphysboro v. Illinois State Bd. of Educ.,* 41 F.3d 1162, 1169 (7th Cir.1994) ("section 300.503(b) limits reimbursement to a single evaluation") and 34 C.F.R. § 300.503.

The School District argues that because Defendants did not appeal the Level II hearing officer's decision, Defendants may not now argue that they are entitled to reimbursement for both independent evaluations. Such an argument is persuasive to the extent that the there is an analogy between an appeal from a hearing officer's decision to the district court and an appeal from a district court to an appellate court. "It is well-established, however, that an appellee may not attack a judgment in order to enlarge his own rights thereunder without filing a cross-appeal." *Tredway v. Farley,* 35 F.3d 288, 296 (7th Cir.1994).

The Court holds that appeals from administrative hearing officers should be treated similarly to appeals from a district court because the IDEA provides that a party dissatisfied with a hearing officer's decision may appeal to a United States District Court. 20 U.S.C. § 1415. In Defendants' answer, they admitted that the Level II Hearing Officer ordered the School District to reimburse the Mother for the costs of only Mary Ellen Gavin's evaluation of Kelly. (Defs.' Answer ¶ 19c.) In addition, in their prayer for relief, they only asked that the Level II administrative decision be affirmed and made no mention of their request that they be reimbursed for both independent evaluations. (Defs.' Answer at 8.) In their briefs in connection with these motions, Kelly and her mother request that the Level II Decision be affirmed. (Br. at 51; Reply Br. at 22). In light of the above facts, Defendants cannot demand enlarged relief when they never appealed from the Level II Review Officer's decision by means of a complaint or counterclaim.

## 5. Defendants' Additional Claims

Defendants assert several additional claims for both compensatory education and reimbursement for private therapy. However, as noted in section four above, they failed to appeal from any decision with which they were dissatisfied. Consequently, for the reasons stated in section four above, these claims too are denied.

### a. Defendants' Claim for Compensatory Education

Alternatively, this Court would deny Defendants' claim for compensatory education because it is not ripe. Defendants argue that compensatory education is an appropriate remedy because Kelly was denied a FAPE and she made little or no academic progress for the two years that she attended the public high school within the School District. A court award of compensatory education requires a school district to provide education either during the summer months or past a child's twenty-first birthday to make up for any earlier deprivation. *M.C. v. Central Reg'l Sch. Dist.*, 81 F.3d 389, 395 (3d Cir.1996). The Third Circuit has formulated a standard for an award of compensatory

education, stating that "the right to compensatory education should accrue from the point that the school district knows or should know of the IEP's failure" allowing, however, for the school district to have some time reasonably required to rectify the problem. *Id.* at 396. *But see Garro v. Connecticut*, 23 F.3d 734, 737 (2d Cir.1994) (requiring a "gross procedural violation" for an award of compensatory education). However, the IDEA requires a FAPE between the ages of three and twenty-one. 20 U.S.C. § 1412. Thus, an award which requires the provision of educational services during that period of time cannot constitute an award of compensatory education. *Manchester Sch. Dist. v. Christopher B.*, 807 F.Supp. 860, 868–69 (D.N.H.1992). In that Kelly is still only 18, and the parties have settled the issue of Kelly's 1998/99 academic year at Eagle Hill, the issue of prospective compensatory education is now moot.

### b. Defendants Claim for Reimbursement for Private Therapy

Alternatively, this Court would deny Defendant's claim for reimbursement for private therapy because they failed to meet their burden of proof. Neither the Level I nor the Level II Hearing Officers' decisions addressed the Defendants' claim for reimbursement for private therapy even though both were presented with the issue. Defendants argue that *Max M. v. Illinois State Board of Education*, 629 F.Supp. 1504, 1518 (N.D.Ill.1986), supports their position that Kelly's parents should be reimbursed for the therapy. In *Max M.*, the Court reimbursed parents for the costs of obtaining private therapy when the school district's psychologist recommended intensive psychotherapy for Max and stated that Max would not experience academic success without such therapy, and the school district provided absolutely no therapy to Max. *Id.* at 1518–19. It is true in Kelly's case that the March 8, 1996, IEP indicated that Kelly should receive psychological and social work services and included no commitment to a number of minutes per week; however, unlike *Max M.*, Defendants have not proved that the school completely failed to provide those services. The school made an effort to provide Kelly

with social work services. Defendants do not provide many details of the factual circumstances under which Kelly's parents sought therapy for her, nor do they argue that therapy was sought for primarily educational reasons. In some situations a free appropriate public education may include both instruction in residential facilities and related support services such as psychological counseling, *see Janzen v. Knox County Board of Education,* 790 F.2d 484, 486 (6th Cir.1986); however, the Defendants have failed to meet their burden of proof.

## IV. SCHOOL DISTRICT'S CLAIM FOR REIMBURSEMENT FROM THE ISBE

The School District's motion for summary judgment on Count II of the complaint asks the ISBE to reimburse the School District if the School District is required to pay for the costs of Kelly's Eagle Hill placement and attorney's fees. The School District argues that it should be reimbursed because Defendant's regulations and practices conflict with the Supreme Court's decision in *Florence County School District Four v. Carter,* 510 U.S. 7, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993).

### A. The Regulations

The IDEA provides

The term "free appropriate public education" means special education and related services that—

(A) have been provided at public expense, under public supervision and direction without charge,

(B) meet the standards of the State educational agency,

(C) include an appropriate preschool, elementary, or secondary school education in the State involved, and

(B) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title.

20 U.S.C. § 1401.

Illinois has passed legislation implementing the IDEA.

A school district making tuition payments pursuant to this Section is eligible for reimbursement from the State for the amount of such payments actually made in excess of the district per capita tuition charge for students not receiving special education services.

\*\*\*

If a child has been placed in an approved individual program and the tuition costs, including room and board costs, have been approved by the Review Board, then such room and board costs shall be paid by the appropriate State agency subject to the provisions of Section 14–8.01 of the Act.

105 ILCS 5/14–7.02.

The Illinois statute goes on to direct the ISBE to promulgate the necessary regulations. 105 ILCS 5/14–7.02. The ISBE adopted the necessary regulations. "A program not approved in accordance with the requirements of this Part shall not be used by school districts to serve students with disabilities under Section 14–7.02 of the School Code." 23 Ill.Adm.Code § 401.10. Other sections of the regulations have additional relevant provisions.

In addition, no school district shall place any student in a non-public special education program, nor shall any program accept placement of any student under Section 14–702 of the School Code, unless all the following conditions have been met.

1) The program has been approved by the State Board of Education for the school year for which placement is sought.

2) The allowable costs for the program have been established pursuant to Section 14–7.02 of the School Code.

3) The district has made the certification of inability to meet the student's needs to the State Superintendent of Education required pursuant to Section 14–7.02 of the School Code and the State Superintendent has found the district in substantial compliance with Section 14–4.01 of the School Code.

4) The program has been approved by the State Board of Education for the student's primary and secondary disabilities.

5) The program has been approved by the State Board of Education for the age range that includes the age of the student.

6) The district has determined that all educational programming and related services specified on the student's IEP will be provided to the student by the facility. The use of a nonpublic facility does not relieve the district of the responsibility for providing all programming and related services required by the IEP.

23 Ill.Adm.Code § 226.430. These regulations prohibit a school district from placing a student in a non-ISBE approved facility and receiving reimbursement from ISBE for that placement.

## B. The Current ISBE Formula Applies to Eagle Hill

The School District directs the Court's attention to the case of *Florence County School District Four v. Carter*, 510 U.S. 7, 114 S.Ct. 361, 126 L.Ed.2d 284, (1993). *Carter* held that parents' failure to select a program approved by the state in favor of an unapproved placement is not a bar to reimbursement. *Id.* at 13, 114 S.Ct. 361. The School District argues that the ISBE's regulations do not conform to *Carter* because the regulations force the School District into a Catch 22: it can either litigate cases such as Kelly's in a due process hearing and undertake all the attendant costs, or it can reimburse parents for private placement without recourse to the ISBE. The School District argues that under the holding of *Carter* the normal reimbursement system is insufficient in the present case because of the extra costs involved in defending its position in litigation.

However, the Supreme Court tailored its holding narrowly in *Carter*:

This case presents the narrow question whether Shannon's parents are barred from reimbursement because their private school in which Shannon enrolled did not meet the § 1401(a)(18) definition of a "free appropriate public education." We hold that they are not, because § 1401(a)(18)'s requirements cannot be read as applying to parental placements.

*Id.* at 13, 114 S.Ct. 361. The school district in *Carter* argued that allowing reimbursement to parents who send their children to unapproved schools would put an unreasonable burden on financially strapped school districts. *Id.* at 15, 114 S.Ct. 361. However, the Court responded

public educational authorities who want to avoid reimbursing parents for the private education of a disabled child can do one of two things; give the child a free appropriate public education in a public setting, or place the child in an appropriate private setting of the State's choice. This is IDEA's mandate, and school officials who conform to it need not worry about reimbursement claims.

*Id.* Thus, the case did not address the issue of whether a school district was barred from reimbursement from the state, only whether a parent was barred from reimbursement.

A Fourth Circuit case has addressed the issue of, as between the state educational agency ("SEA") and the local educational agency ("LEA"), which agency should be liable for the costs of reimbursing a parent for a private placement. *Gadsby v. Grasmick*, 109 F.3d 940, 954 (4th Cir.1997). The court noted that the SEA is the agency ultimately responsible for ensuring compliance with the IDEA. *Id.* However, the court went onto note that "both the language and the structure of IDEA suggest that either or both entities may be held liable for the failure to provide a free appropriate public education, as the district court deems appropriate after considering all relevant factors." *Id.* at 955 (citing *Carter*, 510 U.S. at 16, 114 S.Ct. at 366). One relevant factor the district court should consider in fashioning relief is the relative responsibility of each agency for the failure to provide a child with a FAPE. *Id.* Another relevant factor is the appropriate level of reimbursement that should be awarded. *Id.* The court held that district judges have broad discretion in granting relief under the IDEA and that such relief can permissibly include reimbursement to parents of their costs of a private placement awarded against the SEA, LEA, or both. *Id.*

The ISBE argues that the School District should bear the entire cost because the School District violated the IDEA, and that such a result would encourage full compliance by School Districts. The ISBE goes on to argue that the consequence for failing to comply with the IDEA should be the burden

of reimbursing the parents for the costs of placing the student in a private institution.

■ The Court concludes that the most equitable outcome is one which places the burden of reimbursing the parents for the costs of Kelly's placement at Eagle Hill on both parties under the formula currently in place for approved placements. The Court reaches this conclusion for a number of reasons. First, the Court recognizes the dilemma that the School District faces in the present situation: either litigate and undertake the associated costs even when it wins or leave itself at the mercy of the State and possibly not get reimbursed. Second, the School District should bear a portion of the costs of reimbursement because of its failure to provide Kelly with a FAPE. Third, the ISBE is the agency ultimately responsible for ensuring compliance with the IDEA and is responsible for creating the dilemma for the School District. *Gadsby v. Grasmick,* 109 F.3d 940, 954 (4th Cir.1997). Further, even though the *Gadsby* court placed the financial burden on the school district, the holding in that case did not preclude dividing the costs between the SEA and LEA. This outcome should encourage the ISBE to endeavor to ensure compliance with the IDEA not just at an administrative and regulatory level but also on a individual case-by-case basis.

In addition, the two factor test provided in *Gadsby* also supports this result. The first factor calls for assessing the relative responsibility of each agency for the failure to provide a child with a FAPE. *Id.* In this case, while it was the School District which was primarily at fault for failing to provide Kelly with a FAPE, the degree of the School District's fault was not unlimited. The School District had made efforts to provide Kelly with a FAPE. The issues involved are complex and require a great deal of judgment and discretion on the part of educators and parents. The Court's finding that the School District failed to provide Kelly with a FAPE does not mean that they were not concerned with Kelly and her education.

## C. Attorney's Fees

■ The final issue is the question of attorney's fees. Pursuant to 20 U.S.C. § 1415(e)(4)(B) "the court, in its discretion, may award reasonable attorney's fees as part of the costs to the parents or guardian of a handicapped child or youth who is the prevailing party ." Kelly and her Mother are the prevailing party and are entitled to an award of attorney's fees for their work in this case. The standards governing the award are set forth in the statute. 20 U.S.C. § 1415(e)(4)(C). In the exercise of its discretion the Court holds that any attorney's fees and costs awarded to the Mother shall be divided equally between the School District and the ISBE because, as previously discussed, both share substantial responsibility for this situation.

## V. CONCLUSION

For the foregoing reasons, **the Court grants in part and denies in part the School District's motion for summary judgment against Kelly and her mother and grants in part and denies in part Kelly and her mother's cross motion for summary judgment. The School District is ordered to reimburse Kelly's parents for the tuition costs and related educational costs of Kelly's placement at Eagle Hill School from the time of enrollment through the 1997/1998 school term. The School District is ordered to reimburse Kelly's parents for the costs of her evaluation by Mary Ellen Gavin.**

**The School District's motion for summary judgment against the ISBE is granted in part and denied in part. The ISBE shall reimburse the School District in accordance with its existing formula for approved placements and the School District and the ISBE shall equally share any award of attorney's fees and court costs made to Kelly and her mother in this case.**

**Counsel shall file a petition for reimbursement of tuition and related educational costs, the evaluation by Mary Ellen Gavin, and attorney's fees and court costs within fourteen days, and the School District and ISBE shall meet with counsel to attempt to resolve this issue or shall file specific objections within 21 days thereaf-**

ter. The Court will enter a final judgment after the amounts have been determined.

SO ORDERED.