**T.H., a minor, and L.H. and S.H., individually and as parents and next friends of T.H., Plaintiff,**

**v.**

**BOARD OF EDUCATION OF PALATINE COMMUNITY CONSOLIDATED SCHOOL DISTRICT 15, in their official capacity; Dr. John Conyers, in his official capacity as Superintendent; Dr. Darrell Mittelhauser, in his official capacity as Director of Special Education; Joseph Spagnola, in his official capacity as Illinois State Superintendent of Education, Defendants.**

Nos. 98 C 4633, 98 C 4632.

United States District Court, N.D. Illinois, Eastern Division.

May 14, 1999.

832

Mary E. Moran, Family Law Center of North Shore, Glencoe, IL, Seth Peter Robert, Gary Steven Mayerson, Graubard Mollen & Miller, New York City, for plaintiffs.

John Alexis Relias, Thomas Koutsouvas, Franczek, Sullivan, Mann, Crement, Hein, Relias, P.C., Chicago, IL for defendants.

## MEMORANDUM AND ORDER

MORAN, Senior District Judge.

■ T.H. has just celebrated his fifth birthday. Over the past two and half years, he has cleared some important cognitive, linguistic, and behavioral milestones despite the autism which makes it difficult for him to focus his attention on the task at hand. There can be no doubt that the informed and dedicated involvement of T.'s parents has been instrumental in securing for T. a productive educational environment. But "proof that loving parents can craft a better program than a state offers does not, alone, entitle them to prevail under the [Individuals with Disabilities Education] Act." *Kerkam v. McKenzie,* 862 F.2d 884, 886 (D.C.Cir.1988); Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400, *et seq.*

This action was initiated when T.'s parents (plaintiffs) sought to enforce the decision of the Level II review officer ordering defendant Palatine Community Consolidated School District 15 (district) to pay for T.'s home-based special education program. We granted the parents' request for interim relief on December 2, 1998, and ordered the school district to cover the costs of T.'s "then-current educational placement" until all administrative and judicial review proceedings are completed. The central question presented here is whether the school district and/or the Illinois State Board of Education (ISBE) failed to comply with the requirements of the IDEA and are therefore permanently responsible for the costs of the program unilaterally implemented by T.'s parents.

We have before us a number of pending motions. Plaintiffs and the district have filed cross motions for summary judgment on the merits of the final administrative determination. The district has also moved for summary judgment on its cross claim against the ISBE seeking reimbursement from the State in the event that the district is found liable for T's home-based placement. There are also two motions to clarify our order of December 2, 1998: the district asks us to reconsider the start date of the interim relief and both parties ask us to review a list of disputed expenses. Finally, plaintiffs' petition for attorneys fees is still pending in case number 98 C 4633. We begin with our review of the final administrative decision.[1]

### I. *An appropriate placement for T.*

Three Supreme Court cases establish our task on review. In *Board of Educ. of Hendrick Hudson Central School Dist. v. Rowley,* 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), the Court set out a two-part test to determine whether a child has been given the free appropriate public education (FAPE)[2] he or she is entitled to under the IDEA. A reviewing court must first determine whether the state has complied with the procedural safeguards set out in the Act. *Id.* at 206, 102 S.Ct. 3034. Second, it must determine whether the IEP[3] proposed by the local educational

---

1. We assume a familiarity with the factual and legal background of this case as set forth in our December 2, 1998, memorandum and order.

2. Before the IDEA's recent amendment, 20 U.S.C. § 1401(18) (1990) provided that The term "free appropriate public education" means special education and related services that—(A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program required under § 1414(a)(5) of this title.

3. At the time of T.'s multi-disciplinary conference, the definition of an IEP was codified at 20 U.S.C. § 1401(20) (1990). The provision provided in relevant part that

The term "individualized education program" means a written statement for each child with a disability developed in any meeting by a representative of the local educational agency ... who shall be qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of children with disabilities, the teacher, the

agency is appropriate, *i.e.* "reasonably calculated to enable the child to receive educational benefits." *Id.* at 207, 102 S.Ct. 3034. In *School Committee of Town of Burlington, Mass. v. Dept. of Educ. of Mass.*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985), the Court confirmed that the parents' unilateral placement of a child in an alternative program will not bar reimbursement for the costs associated with the placement, so long as one of the *Rowley* prongs was violated and the parents' placement is found to be appropriate. Finally, the Court held in *Florence County School Dist. Four v. Carter*, 510 U.S. 7, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993), that the placement chosen by the parents need not be certified or approved by the State to qualify for reimbursement.

In T.'s case, the Level II review officer reversed the Level I hearing officer's finding that the school district had violated T.'s procedural rights (Level I at 26; Level II at 23), and the parents have not appealed that portion of his decision. Thus, we must decide whether the district's IEP would have provided T. with an appropriate education and, if not, whether the parents' home-based program was appropriate and thus eligible for reimbursement.

### a. Standard of Review

■ The standards for our review differ from those governing a typical motion for summary judgment. Section 1415(e)(2) of the IDEA dictates that the district court "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and,

basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."[4] Thus, when neither party has requested that the district court hear additional evidence, as is the case here, "[t]he motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record." *Heather S. v. State of Wis.*, 125 F.3d 1045, 1052 (7th Cir.1997). Our decision must be based on the preponderance of the evidence and the school district, as the party challenging the outcome of the state administrative decision, bears the burden of proof. *Id.*, citing *Board of Educ. of Comm. Consol. School Dist. No. 21 v. Illinois State Bd. of Educ.*, 938 F.2d 712, 716 (7th Cir.1991), *cert. denied*, 502 U.S. 1066, 112 S.Ct. 957, 117 L.Ed.2d 124 (1992).

■ In reviewing the administrative record, the district court is required to give "due weight" to the results of the administrative proceedings and is warned "not 'to substitute [its] own notions of sound educational policy for those of the school authorities,' whose decision it is reviewing." *Heather S.*, 125 F.3d at 1052–53 (quoting *Rowley*, 458 U.S. at 206, 102 S.Ct. 3034) (other citations omitted). "[T]he 'due weight' which the court must give to the hearings below is not to the testimony of witnesses or to the evidence—both of which the court must independently evaluate—but to the decisions of the hearing officers." *Heather S.*, 125 F.3d at 1053. Where a state has set up a two-tiered review process, federal courts are required to defer to the final decision of the state

---

parents or guardian of such child, and, whenever appropriate, such child, which statement shall include -
(A) a statement of the present levels of educational performance of such child,
(B) a statement of annual goals, including short-term instructional objectives,
(C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs, ...

(E) the projected date for initiation and anticipated duration of such services, and
(F) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.

4. 20 U.S.C. § 1415(e)(2) was recently recodified at § 1415(i)(2)(B) but the standard of review remains the same.

authorities, in this case, the decision of the Level II review officer (the review officer). *Id.* at 1053–1054.

The school district argues that we should not defer to the review officer because he made a variety of legal and factual errors. In particular, the district contends that the review officer erroneously placed the burden of proof on the district, that he utilized an incorrect definition of "educational benefit," and that he relied on experts who came into the dispute after the IEP was developed while ignoring empirical studies which supported the district's position.

With respect to the burden of proof, we can find no controlling authority for the district's assertion that the parents bore the burden of proof at the Level II hearing. The Seventh Circuit has not addressed the question and other circuits appear to be split.[5] Because of our conclusion below and the standards governing our review, we find it unnecessary to weigh in on this dispute.[6] As for the

district's other objections, we will examine the review officer's formulation of "educational benefit" and will independently evaluate the testimony of the expert witnesses. Ultimately, though, we are mindful of the hearing officer's special expertise in education law and will give the strongest deference to his findings of fact and final conclusions. *See Doyle v. Arlington County School Bd.*, 953 F.2d 100, 105 (4th Cir.1991) (holding that if district court is not going to follow hearing officer's findings of fact, it is required to explain why not).

b. *The district's proposed IEP and settlement offer*

Following two arena assessments of T.'s skills, the school district convened a multidisciplinary conference (MDC) on April 21, 1997, to review the assessment data and develop T.'s IEP.[7] IDEA regulations provide that the IEP may not be completed before the MDC. *See* 34 CFR Part 300, App.C, Q55. The participants accepted Dr.

---

**5.** *Compare Walczak v. Florida Union Free School Dist.*, 142 F.3d 119, 122 (2d Cir.1998) ("[S]chool authorities have the burden of supporting the proposed IEP."); *Carlisle Area School v. Scott P.*, 62 F.3d 520, 533 (3d Cir. 1995) ("In administrative and judicial proceedings, the school district bears the burden of proving the appropriateness of the IEP it has proposed."), *cert. denied*, 517 U.S. 1135, 116 S.Ct. 1419, 134 L.Ed.2d 544 (1996); *E.S. v. Independent School Dist. No. 196*, 135 F.3d 566, 569 (8th Cir.1998) (same); *Clyde K. v. Puyallup School Dist. No. 3*, 35 F.3d 1396, 1398–99 (9th Cir.1994) (same); *with Salley v. St. Tammany Parish School Bd.*, 57 F.3d 458, 467 (5th Cir.1995) ("[T]he party attacking the IEP bears the burden of demonstrating its inappropriateness."); *Doe v. Bd. of Educ. of Tullahoma City Schools*, 9 F.3d 455, 458 (6th Cir.1993) (same), *cert. denied*, 511 U.S. 1108, 114 S.Ct. 2104, 128 L.Ed.2d 665 (1994); *Johnson v. Ind. School Dist. No. 4 of Bixby, Tulsa County, Okl.*, 921 F.2d 1022, 1026 (10th Cir.1990) (same), *cert. denied*, 500 U.S. 905, 111 S.Ct. 1685, 114 L.Ed.2d 79 (1991).

**6.** We note, however, that the review officer based his conclusion, *inter alia*, on the text of 105 ILCS 5/14–8.02(h), which provides in relevant part that

> The school district shall present evidence [at the Level I hearing] that the special education needs of the child have been appropriately identified and that the special education program and related services proposed to meet the needs of the child are adequate, appropriate and available.

Given this state directive to place the initial burden of proof on the school district and the Supreme Court's instruction that the party challenging the administrative decision bears the burden of proof, we think it likely, but do not decide, that the district was required to prove at the Level II review hearing that its proposed IEP was appropriate.

**7.** Attending the MDC were Mr. and Mrs. H.; Ann Maxwell, the parents' Lovaas consultant; and Stacey Stutzman, the parents' attorney. The district was represented by Tracey Bassett, the EIP social worker for the early intervention program (EIP); Leslie Davie, EIP psychologist; Sheri Drew, early childhood program (ECP) occupational therapist; Cindy Gotha, director of ECP programs; Sonya Kallinikos, EIP speech and language pathologist; Kara Marks, ECP social worker; Darrell Mittelhauser, director of student services; Margaret Pragalz, an early childhood classroom teacher; and John Relias, counsel for the district.

Pasternak's diagnosis and recorded T.'s disabling condition as autism. (dist.'s 12m at A23). They also agreed that T. needed and qualified for special education and related services in the areas of cognitive skills, receptive and expressive language, fine motor skills, oral motor skills, social interaction, cooperation, compliance and self-help. *Id.* at 23. Although there was little actual discussion (AR1246), mutually-acceptable goals were developed for T. in most of these areas. Behavioral goals, according to the written report, were to be developed later. (dist.'s 12m at A23).

The parents and the district could not agree on the most appropriate program to help T. achieve the goals identified in the IEP. The school district proposed its "early childhood program" which consisted of attendance in a cross-categorical classroom for 2.5 hours per day, four days a week, during the school year. (*Id.* at 25). His classroom time was to include 90 minutes per week of speech and language therapy, 60 minutes per week of social work, and 60 minutes per week of occupational therapy. (*Id.* at 24). T.'s parents, however, objected to this placement and requested that the district consider the intensive ABA/DTT Lovaas program already in place at T.'s home for 35–40 hours per week.[8] (*Id.* at 25, 40). District officials running the meeting would not discuss the Lovaas program, but ultimately allowed a written summary of T.'s home-based program to be appended to the record. (dist. 12m at A40). The parents requested a due process hearing on April 28, 1997.

### c. *The Level I due process hearing*

After four days of administrative hearings and an exhaustive review of the record, the Level I IHO issued a fifty-eight page opinion on December 21, 1997, finding that the district's IEP was deficient on two levels. First, as a educational proposal, the early childhood program was "substantively inadequate" to meet T.'s needs. She found that it was not based on the recommendations of autism experts and did not provide sufficiently intense, one-on-one training. She highlighted the testimony of one witness who reported that 3–4 teacher/student interventions per minute are necessary for an autistic child to make progress, a rate impossible to achieve in a multi-student environment. (Level I at 33). The IHO acknowledged the testimony of district personnel expressing their discomfort with the intensive Lovaas approach, but was unpersuaded by their "vague, generalized, non-specific, eclectic, child-led approach to educating autistic children." (Level I at 16). She further found that the improvements observed by the early intervention team, such as T.'s new ability to sit and be attentive to learning, could not be attributed to his participation in the district playgroup, but were the result of the ABA/DTT program already in place at T.'s home. The district's failure to "properly address T.'s need for a behavior management plan" also rendered the plan substantively inadequate, as did the absence of any provision for an extended school year. Finally, the hearing officer concluded that the school district's offer to double T.'s classroom time did not remedy the substantive deficiencies in the

---

8. We use these terms rather inexactly here. Ann Maxwell testified that the Lovaas program is Professor Ivar Lovaas' version of applied behavioral analysis (ABA). ABA is the use of observation data to develop behavior modification procedures that are most effective for an individual child. (AR1005; 1119). Discrete trial teaching (DTT) is one component of the Lovaas type of ABA and involves a directive followed rapidly with a consequence based on whether the student gives the correct response. (dist.'s memo at 6; 12m at 11). Dr. Mulick explained that Professor Lovaas was only one of many scientists applying behavior modification theories to the treatment of severe behavior disorders in autistic children, and that many of the original Lovaas techniques are no longer considered appropriate, *e.g.* using electroshock as an adverse consequence. Thus, we use "ABA/DTT" throughout this opinion as shorthand for the current constellation of behavioral and language training approaches which utilize an intensive discrete trial format and continuous modification according to the child's observed progress.

IEP, in part because there was no specific plan for the additional ten hours.

Beyond the substantive shortcomings of the proposed IEP, the IHO found that the district failed to "individualize" the program to meet T.'s unique needs and instead chose the early childhood program because it was the only available school-based placement for T. (Level I at 19). Her conclusions in this regard often focus on the district's level of care. The IHO suggests that the district willfully disregarded information about T.'s capabilities in order to justify the placement on which they had already settled. In her opinion, the district failed to "consider[ ] what would be minimally adequate for this child" even though they understood his unique characteristics as an autistic child. (Level I at 18). She found that "school district personnel were aware that, according to the neurologist, T.'s diagnosis presented unique needs which required an intensive, consistent behavioral intervention program employing discrete trial teaching." *Id.* at 13. She also emphasized the fact that some of the individuals who helped develop the IEP knew from direct observation that T. had trouble in group settings and that his participation in the playgroup required intense adult intervention. Thus, it was unacceptable that the IEP called for significantly less contact than the three-on-one attention T. often received in the playgroup. (Level I at 13, 18). The district appealed the Level I decision on January 8, 1998.

#### d. *The Level II Review Hearing*

Neither party chose to call witnesses for the Level II review hearing. The school district made many of the same arguments that it renews here. Citing *Rowley,* the district argued that it need only provide an IEP reasonably calculated to enable the child to receive an "educational benefit." Level II at 7. Furthermore, the district argued, *Lachman v. ISBE,* 852 F.2d 290, 296 (7th Cir.), *cert. denied,* 488 U.S. 925, 109 S.Ct. 308, 102 L.Ed.2d 327 (1988),

holds that where a placement dispute is based on a disagreement about educational methodology, the school district and not the parents have the primary responsibility for "choosing the educational method most suitable to the child's needs." (Level II at 11). The district concluded that it had fulfilled its obligation and consequently was not required to reimburse T.'s parents for the costs of their unilateral placement decision. The parents protested the district's characterization of the dispute as one over "methodology," suggesting instead that the heart of the matter was whether the district's efforts were "reasonably calculated" to provide T. with an educational benefit. Plaintiffs argued that the weight of the evidence showed the district's recommended placement would be ineffective, and that the district had not contested the IHO's conclusion that T.'s home-based placement was appropriate.

Applying the *Rowley* test, the Level II review officer ruled that the school district failed to prove that its IEP was "reasonably calculated" to provide T. with "educational benefit." Even assuming that the school district would have modified the IEP within thirty days to provide for a behavioral plan, an extended school year, and appropriate percentage target levels for mastery of the identified goals and objectives, the IEP would not enable T. to progress at a rate sufficient to meet the primary objective, namely successful transition to a regular education classroom. (Level II at 28). The placement recommended by the school district, therefore, was inappropriate.

#### e. *Analysis*

■ We agree with the Level II review officer's conclusion that neither the district's April 21, 1997 IEP nor the amended version made in an attempt to settle the due process dispute was an appropriate placement for T. The evidence shows that T. has the capacity to acquire new skills when the educational environment is free from distractions and when there is contin-

uous intervention by an adult trained to focus T.'s attention on an appropriate exercise. The district's IEP did not provide for either precondition.

### i. *Methodology*

The district points to *Lachman* for the proposition that the school district has the right to dictate the appropriate educational methodology, but the case is distinguishable from T.'s on a number of levels. First, the school district in *Lachman* was advocating a particular methodology—the "total communication" approach—over the "cued speech" method preferred by the parents. Second, the Regional Hearing Impaired Program proposed by the district was considered to be one of the best in the country, and the district presented a number of experts on educating hearing impaired children who could testify to the benefits of the proposed program. In affirming the school district's placement for the child, the Seventh Circuit noted that the IEP included an interim use of the parent-preferred "cued speech" approach to the extent necessary to effectively transition the student into the "total communication"-based program. *Lachman*, 852 F.2d at 291. The evidence also supported the district's contention that the student would succeed in the district's placement. Witnesses testified that the student worked well with other children, was meeting academic expectations, was making social progress in the classroom, and was "satisfied with himself and with his capacities and his relationships to others within his environment." *Lachman v. ISBE*, 1987 WL 16625, *4 (N.D.Ill.). Both administrative hearing officers, the district court judge, and the Seventh Circuit, therefore, found no reason to override the district's appropriate placement.

In this case, while some of the district staff are "uncomfortable" with the Lovaas approach, they cannot articulate a particular methodology which they prefer.[9] *See, e.g.*, AR776–77. When Dr. Lorber went to observe the early childhood classrooms, he found that the teachers could not describe or easily discuss their approach to teaching autistic children. (AR1269). Although some of the classrooms included children who appeared to have a more severe form of autism than T., Dr. Lorber did not observe a single child receiving intense individual intervention or a single effective use of DTT. (AR1272). The early childhood program is not specifically designed to meet the needs of autistic children and the district did not present any testimony which would indicate T.'s ability to adapt to the new program. Nor did the district's IEP include an interim ABA/DTT component to facilitate T.'s transition into the new environment. If the school district's IEP is not substantively appropriate, *Lachman* is irrelevant. *See Board of Educ. of Comm. Consol. School Dist. No 21*, 938 F.2d at 717 ("*Lachman* holds that a state-proposed IEP which meets the substantive requirements of the [IDEA] cannot be defeated merely because the parents believe a better educational program exists for their child.").

### ii. *Individualization*

But even if we grant that the district has a viable methodology in place, the heart of this dispute is whether the district has adequately tailored its methodology for T., chosen the right setting for T.'s training, or allocated sufficient resources to allow T. to benefit from that methodology. *See Union School District v. Smith*,

---

9. Although Cindy Jacobson, the occupational therapist in the early intervention program, testified that she attends autism conferences, AR806, she conceded that she had never heard of the Lovaas program until Mrs. H. told her about it. Ms. Jacobson explained that she "tend[s] to use what we call floor times which is a method of Dr. Stanley Greenspan," and described it as "following the child's lead." (AR818, 825). She did not explain how this generic approach could be effective for autistic children like T. who have problems "attending." *See also* Level II at 31. The district did not present a single early childhood teacher with significant training in the education of autistic children.

15 F.3d 1519, 1525 (9th Cir.) (deferring to judgment of hearing officer that placement was inappropriate for autistic child "because it was insufficiently individually designed to meet [the child]'s special needs"), *cert. denied*, 513 U.S. 965, 115 S.Ct. 428, 130 L.Ed.2d 341 (1994). We conclude that the district did not sufficiently individualize its early childhood program to ensure that T.'s placement in it would not be regressive.

Cindy Gotha coordinates the early childhood program for the district. She testified at the Level I hearing that the program includes five cross-categorical classrooms with morning and afternoon sessions of 2½ hours each. (AR 861). The classes meet only Monday through Thursday so that Fridays can be "reserved for a variety of activities that involve parent and children, parents, parent education, team meetings and teacher evaluations." *Id.* The April 21st IEP called for T. to attend the morning session four days a week. Each classroom is staffed by one teacher and two program assistants for the maximum of ten children. Ms. Gotha testified that "if there's a need for more personnel we take a look at that individual classroom and the needs of the children. If we need to add additional personnel, we do so." (AR 862). At the time of the hearing, 61 students were enrolled in the program, six of whom fell within the autistic spectrum. None of the six had been assigned an individual aid.

It seems clear from the evidence that T. was just not ready for the district's early childhood classroom, especially without an aid to keep him on task. Every one of the autism experts who testified below felt that the cross-categorical classroom was not the best setting for T.'s training and was clearly inappropriate if T. were to participate without an individual assistant.

According to Dr. Luce "early training should be done in a setting where distractions are minimized[,] in a setting in which the child can ... have opportunities to respond at a very high frequency." (AR1008). Dr. Mulick suggested that for "a child with autism and specific language deficits, home is a more likely setting in which to learn to speak simply because the object, people and routines are of personal meaning to the child." (AR1092). The person who knew T. best, his mother, was convinced that the highly stimulating classroom setting would make it difficult for T. to learn. (AR950). She testified that during circle time in the playgroup, "He was kicking and screaming and yelling and flailing to try not to be sitting in that circle. He could not hand[le] the singing in the room, the loud noises.... In subsequent sessions ..., we had sometimes two people holding him down in the circle[,] Sonya and I." (AR931). The testimony from district personnel was consistent with Mrs. H.'s account. Tracey Bassett testified that even after T.'s "improvement" in the playgroup he would still need some adult physical containment to keep him in the classroom. (AR746).

The expert testimony on the required level of adult intervention also indicates that the IEP was inadequate. Dr. Bennett Leventhal testified that "this is a kid who needs a fairly high student/teacher ratio and needs a lot of complex and coordinated intervention between language and communication people, behavioral management people as well as social skills development folks, and I don't think those elements were in the IEP." (AR1375). When asked whether T. would receive "any benefit" from the cross-categorical setting, he answered "[I]t's not even close." Dr. Leventhal and his colleagues at the University of Chicago [10] reviewed the district's proposals

---

10. Bennett Leventhal, M.D., Chair, Department of Psychiatry and Director of Child and Adolescent Psychiatry Chair, and Catherine Lord, PhD, Director of the Developmental Disorders Clinic. The district objects to the consideration of this testimony because Doctors Lord and Leventhal evaluated T. after the IEP was developed. (dist. memo at 27). If we were reviewing the district's adherence to procedural standards, the district's argument

for the parents and concluded that "placement of [T.] into a program with insufficient individual programming and structure and/or without a clear behavioral plan, even for a few weeks, is inappropriate and would be regressive." (AR1390). As the Second Circuit held in a case cited by the district (dist. memo at 24), an appropriate public education under the IDEA is "one that is likely to produce progress, not regression." *Walczak v. Florida Union Free School Dist.*, 142 F.3d 119, 130 (2d Cir.1998) (citation and internal quotation marks omitted).

### iii. *The IEP development process*

It seems clear that the IEP development process in T.'s case was dysfunctional. This is not to say that the IDEA's procedural guarantees were violated, but rather that the collective knowledge of the group was not well-used to come up with a constructive and thorough plan for T. The record indicates that Mrs. H. was open to a variety of placement options for T. so long as the program provided intensity, an appropriate setting, and arrangements for naptime. (AR1253). She suggested at one point to Ms. Gotha that perhaps the district could provide an ABA/DTT aid to accompany T. in the classroom.[11] Ms. Gotha acknowledged that the district had never done that before, but did not rule it out. (AR1255). For some reason, however, the format of the MDC precluded a

discussion of these sorts of alternatives.[12] The conference was adjourned with what can best be described as a IEP-in-progress.

Ms. Gotha's testimony emphasized that her program works hard to individualize a child's program according to his or her developmental stage, tolerance for activities, and the goals identified for the child. But as Dr. Lord later observed, "Although a number of appropriate goals were identified in the current IEP [for T.], the program intended to meet these goals was not sufficiently specified." When asked why T.'s IEP did not include evaluation criteria or schedules, Ms. Gotha suggested that the IEPs are typically refined after personnel in the early childhood program "take a good look on a day-to-day basis."

> We have the privilege of doing that—as children are then a part of a program, we have the privilege of doing that, then further refining that process and developing what kind of techniques we're going to use in really refining the whole plan for the child.

(AR866). She acknowledged that in T.'s case "We had not really planned his program yet. We just got to the point where we had developed some initial goals and objectives." (AR871).

The problem with this approach, of course, is that it required T.'s parents to gamble with his future.[13] The district's

---

for excluding this testimony would have some merit. The experts' assessment of the IEP's substantive adequacy, however, is certainly relevant as to whether the placement was and is appropriate for T.

11. According to Mrs. H., Ms. Kallinikos first suggested to her in January that the cross-categorical classroom could be used to complement the Lovaas program. (AR928). Ms. Gotha further acknowledged in her testimony that integrating strategies have been used effectively by the district for students with autism. (AR883–86). She confirmed that at least in one case the parents' DTT trainer worked with the student at school, and school personnel and the trainer "jointly taught one another what some best techniques are to

work with [the] child." (AR886). It is all the more baffling, therefore, that the district was unwilling to consider the parent's request to incorporate T.'s ABA/DTT program in the IEP.

12. For example, Mrs. H. testified that Dr. Pasternak's diagnosis was discussed at the MDC, but not his treatment recommendation. "We weren't even allowed to discuss it.... We had to fight just to get him [to] let us write it down in the parent comment section." (AR944–945).

13. At the Level I hearing, Mrs. H. discussed her decision to begin the Lovaas program before the MDC. (AR942–943). "I had a choice to either wait until the IEP was done

educational staff are obviously dedicated and well-intentioned and they may well have hired the additional teachers, carefully programmed the additional hours, and settled on the appropriate techniques to help T. achieve his goals. But there was little in the plan to engender the parents' confidence in the system. Those most familiar with T.'s history contributed only to the development of the goals but not the implementing program. Sonya Kallinikos, the district's speech pathologist, conceded that she would have recommended an extended school year for T., but "[she] wasn't running the meeting." (AR798). The psychologist who administered the IQ tests left before the session had concluded. (AR857). Ms. Gotha had spent a total of five minutes with T. before the IEP was developed and confirmed in her testimony that the district did not involve an autism expert in the consideration of T.'s program. (AR898). The only early childhood classroom teacher to attend the MDC acknowledged that she hadn't met T., had

not observed T., had spent little time before the IEP learning about him, and hadn't read any of the experts' reports. (AR1596–7). Despite the strong advice from doctors Pasternak and Mulick that consistency was critical, the district made no provision in the IEP for integration of T.'s ABA/DTT program into his classroom curriculum, even as a transitional strategy.

If the time was too short at the initial session, another could have been scheduled right away to explore opportunities for compromise.[14] Ongoing dialogue and earnest modification of the draft IEP might have eliminated any need to initiate a due process hearing. But based on the district's track record, it would be unreasonable to expect T.'s parents to send him into a questionable placement based on a pledge of later individualization. Even the district's settlement offer missed the point.[15] When the district offered to increase the hours that T. would participate in the program, there was no indication

for a program that I was told was going to be offered to him, a program for which they gave me nothing to show its effectiveness. On the other hand, I had a program that was recommended by my pediatric neurologist. I had a program that had scientific evidence behind it to show that it was effective ... I decided that it wasn't—as a responsible parent, I couldn't wait ..."

Dr. Lorber felt he could not advise Mr. and Mrs. H. to risk "degeneration of his skills, loss of ability[, or] acquisition of inappropriate behavior" in the district's program. (AR 1278). Doctors Leventhal and Lord felt it would be "irresponsible" to try the district's program as an experiment. (AR1378). Dr. Mulick recommended that T. continue the home-based program because it was already in place and it was clearly providing a benefit. He explained that

[T]he difficulty that you have with recommending a change in such monumental proportions, in any educational program in which a child is showing dramatic benefit, is that you don't have any evidence about the alternative at the same time; unless, as is possible in some rare cases, where you have a child attending a school program at the same time that's having a home program, then you can make a direct comparison.

(AR1092). The only standard for comparison here was not encouraging. When asked by the IHO whether she had "given the school district a chance to try," Mrs. H. responded that she "believe[d] the play group setting was a very good model of what the cross-categorical classroom was like" with the only difference being that she "wouldn't be there in the classroom to keep him from running out of the room or to keep him on task." (AR1238–39).

14. We are skeptical that 23 IL Administrative Code 226.560 can be used to excuse the absence of critical components of the IEP, as the district argued before the review officer. (Level II at 23). Read in context, that provision requires that a separate meeting be held to develop an IEP if the initial MDC was "held for the purpose of determining eligibility." Moreover, there is no indication in the record that another meeting was proposed or scheduled to occur within thirty days of the April 21 MDC.

15. Responding to a direct question from the IHO, Dr. Mittelhauser confirmed that the additional hours had been offered to T. in an effort to avoid the due process hearings, not because the district staff believed this would make T.'s program more appropriate. (plf's memo at 16).

how these hours would be used. (AR 956). It was not clear to the parents or district personnel, for example, whether the classroom teachers typically repeated the curriculum from the morning session in the afternoon session. In fact, Dr. Mittelhauser appeared to be the only individual with information as to the specific components of the settlement offer. He stated that the amended IEP would provide "one half day of [regular] kindergarten and the other half day I believe was special education ... in a five-year-old special education classroom," plus "other services." (AR913). It is hard to believe that the district felt it could answer the parents' concerns about T.'s readiness for a classroom setting by placing him in a non-special education classroom without an assistant.

#### iv. *"Educational benefit"*

The district argues that the review officer utilized an incorrect definition of "educational benefit" when he required the district's IEP to facilitate T.'s "progress in the areas of the goals and objectives contained in his IEP, at a rate enabling him to make a successful transition to a regular education kindergarten and/or primary grades classroom." (Level II at 28). He settled on this benchmark based upon "uncontested information in the case record concerning the Student's needs and capabilities, as well as upon the Level II Hearing Officer's understanding of the preference, underlying the IDEA, for integration of Students with educational disabilities into the regular education environment." *Id.* He acknowledged that an IEP need not provide "either the *most* successful or the *most* rapid possible integration of the Student into a regular education environ-

ment," *id.* (emphasis in original), it need only be "successful."

The district contends, however, that because T. showed some improvement in the playgroup, he can likewise be expected to show some improvement in the early childhood classroom. The review officer's standard, the district asserts, incorrectly imposes an obligation on the district to "cure" T. or to give him an optimal program, neither of which is required under the IDEA. In response, the parents offer an analogy to swimming lessons:

> [T]he Level II hearing officer was not ordering the School District to groom T.H. to become an Olympic swimming champion. The goal is not to have T.H. sitting on the "steps" of the pool. Nor is it to have T.H. drown in the deep end because he was thrown into that environment before he was ready to do so. The Level II hearing officer merely directed services which were "reasonably calculated" to provide T.H. with a meaningful opportunity to achieve some measure of success "swimming" with typically developed children.

(plf.'s memo at 33 n., * 13). While we often find metaphors to be of limited usefulness, this one does a good job of focusing our attention on whether the district's IEP would help equip T. with the tools he'll need to benefit from a public education.

■ *Rowley* directs that the IEP must be "reasonably calculated to *enable* the child to receive educational benefits." 458 U.S. at 206–207, 102 S.Ct. 3034 (emphasis added). And while the district latches on to the Seventh Circuit's rephrasing of the requirement in Heather S. as a singular "educational benefit," the floor surely cannot be so low as to allow the district to squander T.'s later potential for learning.[16]

---

16. The district argues that the review officer employed a double standard when considering the empirical evidence submitted by the parties. The district complains that two studies cited by the district were ignored because they "did not indicate the extent to which the diagnostic profiles of the students in these

programs corresponded to that of the student in this case," while the conclusions of similar studies offered by the parents were accepted. Level II at 30–31.

It is true that the review officer did credit the testimony of Dr. Mulick even though he based his conclusions about T. on analogous

Indeed, the purpose of the IDEA is to "'open the door of public education.'" *Bd. of Educ. of Murphysboro Comm. Unit School Dist. No. 186 v. ISBE*, 41 F.3d 1162, 1166 (7th Cir.1994), quoting *Rowley*, 458 U.S. at 192, 102 S.Ct. 3034; dist. memo at 24. The experts testified that there is a critical developmental window for autistic children with language and behavioral deficits. *See, e.g.*, AR1007, 1010, 1021, 1094–1097. Without sufficient adult intervention now to help reprogram T.'s young brain, his opportunity for "meaningful access to education" may be permanently foreclosed. *See Irving Ind. School Dist. v. Tatro*, 468 U.S. 883, 891, 104 S.Ct. 3371, 82 L.Ed.2d 664 (1984); *see also Walczak*, 142 F.3d at 130.

This is the point of the parents' mainstreaming argument and the review officer's definition of "educational benefit." The IDEA explicitly provides that states receiving federal funds must "establish procedures to assure that, to the maximum extent appropriate, handicapped children . . . are educated with children who are not handicapped." 20 U.S.C. § 1412(5); *Bd. of Educ. of LaGrange School Dist. No. 105 v. ISBE*, 1998 WL 792479, *6 (IDEA creates statutory presumption in favor of mainstreaming) (N.D.Ill). The experts who evaluated T. found that with sufficient consistency and focus, T.'s young brain can be reprogrammed to ameliorate some of the language and behavioral disorders associated with autism. (AR1005). If his brain

is given these new pathways and strategies now, while it is still developing, he will be able later to more fully participate in a mainstream classroom. Until then, "group activities and interactions with other children are of little present benefit to [T.]." (AR719–22, 1010, 1043). The floor provided by the IDEA requires the district to provide an IEP reasonably calculated to enable T. to participate in a mainstream classroom to the maximum extent appropriate. Neither IEP proposed by the district met that standard.

Both administrative law judges agreed with T.'s doctors and parents that the district's cross-categorical classroom would not have enabled T. to achieve the goals set out in his IEP. While we cannot say that the district's early childhood program could not have been structured to provide T. with an appropriate education, we can say that the preponderance of the evidence shows that neither the April 21, 1997 IEP nor the settlement offer constituted an appropriate placement for T. given his unique needs and capacities. The incomplete IEPs failed to meet the requirements of 20 U.S.C. § 1401(20) and were not reasonably calculated to enable T. to receive educational benefits in preschool or beyond.

### f. The parents' unilateral placement

■ Having carefully reviewed the record, we concur with the hearing officer

studies showing that early home-based intervention programs show greater benefits than center-based programs. But the articles cited by the district only confirm Dr. Mulick's position. In one of the two, for example, the mean IQ for students in the school-based placement increased from 61.7 to 64.3; while the mean IQ in the home-Lovaas group increased from 62.8 to 89.7. (dist. 12m, ExI, at 3, 23).

The district points out that even the students who attended the center-based programs for approximately 10 hours per week did make some modest gains in reported IQ scores. And, the district argues, some gain in IQ is all that is needed to show that the district's program would have provided T. with "an educational benefit." (dist. memo at

36). Like the review officer below, we reject the notion that an average increase of less than 3 IQ points over two years shows that a school-based placement gives enough of an educational benefit to meet the requirements of the IDEA. *Accord Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171, 183 (3rd Cir.1988) ("trivial educational advancement" is insufficient), *cert. denied*, 488 U.S. 1030, 109 S.Ct. 838, 102 L.Ed.2d 970 (1989). If anything, the study merely bolsters the parents' contention that the district should have considered adopting the home-based therapy. After all, the point of individualizing a treatment program for a disabled child is to increase the benefit that he or she derives from an educational setting.

and the review officer that the parents' placement for T. was appropriate. The 38–hour ABA/DTT program was reasonably calculated to enable T. to receive educational benefits. We find the district's arguments as to the "non-variability" and lack of "individualization" of the parents' program to be preposterous in light of the evidence. The program designed by Ann Maxwell, T.'s parents and the other experts with whom they consulted has carefully targeted T.'s specific challenges and capacities. The discrete trials at the heart of the program are constantly refined according to T.'s individual progress. Indeed, the guiding principle is to address T.'s specific linguistic, cognitive, motor, and behavioral deficits so that he may successfully transition to a mainstream classroom. The review officer found that the therapists employed for the home-based program received adequate training and noted T.'s "significant educational gains" resulting from their work.

We also find unpersuasive the district's contention that the program is inappropriate because it includes too many hours. Although the number of hours that the parents chose to include as compared to the experts' assessment as to what would constitute an appropriate program is relevant for the purposes of reimbursement, we find no evidence in the record to support the notion that a 38–hour program would be inappropriate for T.

## II. *Reimbursement*

### a. *Reasonable Expenses*

■■■ Having found that the district's proposed placement violated the IDEA and that the parents' unilateral home-based placement was appropriate, we are authorized to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2). Under this provision, "equitable considerations are relevant in fashioning relief." *Burlington*, 471 U.S. at 374, 105 S.Ct. 1996. This includes reimbursing parents for the costs of private special education if the court determines that such placement, rather than the proposed IEP, is proper. *Id.* at 369, 105 S.Ct. 1996. We are not required to provide total reimbursement if a portion of the cost was not reasonable or necessary. *Florence*, 510 U.S. at 16, 114 S.Ct. 361. On the other hand, financial hardship on the part of the school district will not bar reimbursement to the parents. As the Court made quite clear in *Florence*, "[P]ublic educational authorities who want to avoid reimbursing parents for the private education of a disabled child can do one of two things: give the child a free appropriate public education in a public setting, or place the child in an appropriate private setting of the State's choice. This is IDEA's mandate, and school officials who conform to it need not worry about reimbursement claims." *Id.* at 15, 114 S.Ct. 361.

The district contends that the 38–hour program is excessive and that if it is ordered to provide any reimbursement, we should alter the administrative orders to include only 20 hours of home-based therapy. The record does show some disagreement among the experts as to the number of hours necessary to achieve sufficient intensity for T. to make progress. The Lovaas program calls for 40 hours. Doctors Lord and Leventhal thought 25 hours might be appropriate, while the children in the experimental group of the Sheinkopf and Siegal study proffered by the parents and cited by the district received anywhere from 12 to 43 hours of intervention per week. Dr. Pasternak originally suggested that T.'s program consist of 20–40 hours each week Plaintiffs note that T.'s "every waking hour ... could be dedicated to promoting and reinforcing appropriate behaviors and communications, and eliminating behaviors and social interactions which are considered inappropriate." (plf. memo at 12).

■■■ We are obligated here to give due weight to the final conclusion of the review officer that reimbursement for the full 38–

hour program was justified. Because the parents' program does not exceed the range of appropriate treatment levels recommended by the experts and because the district does not argue that any particular component is frivolous or superfluous, we find that the expenses included within the Level I reimbursement order, as modified by the Level II decision, were reasonable. Other relevant equitable factors also cut in favor of full reimbursement for the parents. The school district had an opportunity to evaluate T. before recommending a program. *See Ash v. Lake Oswego School Dist., No. 7J,* 980 F.2d 585, 589 (9th Cir. 1992). The parents were open to alternative placements and proposed several ideas, while the school district maintained an "uncooperative position," at least at the MDC. *See Burlington,* 736 F.2d at 799; *Alamo Heights Indep. School Dist. v. State Bd. of Educ.,* 790 F.2d 1153, 1161 (5th Cir.1986); *Murphy v. Timberlane Regional School Dist.,* 973 F.2d 13, 16 (1st Cir. 1992). The parents promptly requested the due process hearing and every decision since has been in their favor. *See Ivan P. v. Westport Bd. of Educ.,* 865 F.Supp. 74, 81 (D.Conn.1994) (collecting cases on this factor). We find no equitable justification for reducing the level of the parents' reimbursement.

### b. *Clarification of the interim order*

Both the district and the parents have asked us to clarify components of our interim order. Although we have now ruled on the merits and find that T.'s parents are entitled to permanent reimbursement, we clarify the order on the chance that one or more of the parties to this action appeals this decision to the Seventh Circuit. In that case, the interim order would remain in place until all judicial proceedings have concluded. Additionally, some of the challenged expenses would be an issue under either the interim or final order.

The district asks us to reconsider the start date of the interim relief and makes a rather contorted argument for the use of the Level II decision date. The district argues that the stay-put provision refers to an agreement between the state and the parents to change the then-current placement. 20 U.S.C. § 1415(j). It further contends that the Level II hearing is the "state level hearing" based on its reading of 34 CFR § 300.510(b) which provides

(b) Appeal of decisions; impartial review.

(4) General. If the hearing required by § 300.507 is conducted by a public agency other than the SEA [state educational association], any party aggrieved by the findings and decision in the hearing may appeal to the SEA.

(5) SEA responsibility for review. If there is an appeal, the SEA shall conduct an impartial review of the hearing.

The district's reading is too strained. The regulation merely requires that the state regime provide for at least one hearing before the state educational association. Moreover, the text of the Illinois statute which governed IDEA proceedings at the time of T.'s IEP reveals that *both* the Level I and Level II hearings are "state level" hearings. 105 ILCS 5/14–8.02. *Accord Township High School Dist. No. 211 Cook County, Illinois v. Ms. V.,* 1995 WL 103667, *3 (N.D.Ill) (holding that "the two potential levels of state hearings do not offend the IDEA"). Section (h) of that provision, for example, established the procedures for the Level I hearings and dictated that a request for a due process hearing shall be forwarded by the local school district "to the State Superintendent," after which "the State Board of Education shall provide a list of 5 prospective, impartial hearing officers." 105 ILCS 5/14–8.02(h). The provision also details how the State is to recruit, train, and pay these Level I hearing officers.

We also stand by our earlier conclusion that the principles behind the *Burlington* decision argue for using the Level I deci-

sion date as the starting point for the statutory injunction. 1998 WL 850819, *4–5 (N.D.Ill.), citing *Burlington,* 471 U.S. at 372–373, 105 S.Ct. 1996; *see also Bernardsville Board of Educ. v. J.H.,* 42 F.3d 149, 156 n. 12, 159–160 (3d Cir.1994) (initiation of review proceedings places school district on notice that parents intend to pursue appropriate placement and reimbursement); *Delaware County Intermediate Unit No. 25 v. Martin K.,* 831 F.Supp. 1206 (E.D.Pa.1993) (parents entitled to rely on state administrative decision in their favor whether or not program was appropriate). The district notes that two decisions cited in our interim order utilize the date of the Level II hearing as the start date for interim relief. *See Board of Education of Oak Park & River Forest High School Dist. No. 200 v. ISBE (Oak Park I),* 10 F.Supp.2d 971, 982 (N.D.Ill. 1998); *St. Tammany Parish School Bd. v. State of La.,* 142 F.3d 776 (5th Cir.1998). But in both of those cases the review officer had reversed the findings of the first hearing officer and ordered additional reimbursement for the parents. In *Oak Park I,* the Level II review officer determined that the parents were entitled to reimbursement for the room and board associated with the student's placement at a residential facility. *See Board of Education of Oak Park & River Forest High School Dist. No. 200 v. ISBE (Oak Park II),* 21 F.Supp.2d 862, 873 (N.D.Ill.1998). In *St. Tammany,* a review panel reversed the decision of the independent hearing officer and concluded that the school district was obligated to reimburse the student's parents for the costs of his residential placement. 142 F.3d at 780, 787. Thus, in both cited cases, the date of the review decision constituted the first date of agreement that, during the pendency of the administrative and judicial proceedings, the parents' placement was the appropriate educational placement for the purposes of the stay-put provision.

With respect to the reimbursable expenses under our interim order, we find that the parents have made the rather puzzling decision to seek reimbursement for T.'s participation in a cross-categorical private preschool classroom. The decision is not necessarily inconsistent with their position during the due process hearings because T. is apparently accompanied by a full-time individual assistant, but without further explanation it does undermine their opposition to the district's proposed setting. Moreover, our interim relief order affirmed the parents' right to reimbursement for the new "then-current educational placement" as found by the Level I hearing officer. The private preschool, as far as we can determine, was not proposed during that hearing or incorporated in the Level I decision. (dist. memo re clarification at 3). We find, therefore, that the district is not required to reimburse T.'s parents for those expenses. To the extent that the one-on-one aide would be working with T. at home rather than in the preschool classroom, we assume this cost would be subsumed within the 38–hour program.

We also agree with the district's interpretation of the Level I order that "annual parent training" (Level I order at 1F) does not include the costs of both the January and March conferences, unless only one parent attended each. We read the hearing officer's order as providing one annual training conference, workshop, or program for each parent. We assume that the parties have worked out their disagreement as to covered educational materials. (dist. memo re clarification at 4).

### c. *State or district responsibility for reimbursement*

The district moves for summary judgment on its cross-claim against the ISBE and its former Superintendent, Joseph Spagnola,[17] claiming that if full reimbursement and attorney's fees are owed to T.'s

---

17. On March 4, 1999, we granted the district the right to substitute Dr. Glenn McGee, the current State Superintendent of Education, for Joseph Spagnola.

parents they should be provided by the ISBE and not the school district. The district rests its claim on two theories.[18] First, state regulations would have prohibited the district from incorporating T.'s home-based program into his IEP because it was not an approved program. Thus, if the district violated the IDEA, it is the state's fault. Second, the district argues that the State is in violation of the IDEA because it has not altered its reimbursement procedures to account for the Supreme Court's decision in *Carter*, 510 U.S. at 13–14, 114 S.Ct. 361 (affirming that the parents unilateral placement need not be certified or approved by the State to qualify for reimbursement). The gist of the district's position is that it was stuck between a rock and a hard place and should not have to pay a dime for maintaining the only position legally available. Magistrate Judge Denlow recognized a school district's predicament in those circumstances in *Oak Park II*, 21 F.Supp.2d at 883.

■ We are sympathetic but ultimately unpersuaded by the district's arguments. As our discussion above indicates, there was a substantial opportunity to individualize a placement for T. within the district's early childhood program given sufficient creativity, dedication, and allocation of resources. If the district was concerned about its ability to recoup expenses in excess of the district per capita tuition charge for students not receiving special education services, *see* 105 ILCS § 5/14–7.02, it could have worked harder to develop an appropriate placement that was approved by the state. At that point, it would have been up to the parents to choose between the FAPE offered by the school district and the ABA/DTT program they had initiated at home. While we recognize that the state educational agency bears the ultimate responsibility to see that IDEA goals and policies are implemented, the district's failure to provide an individualized, appropriate placement cannot here be charged to the ISBE. *Cf. Beard v. Teska*, 31 F.3d 942, 954 (10th Cir.1994) (Shadur, J.) (concluding that "the sensible (and established) reading of Section 1412(6)" does not make the state agency "an absolute insurer required· to make good the damage" every time a local agency fails to comply with the requirements of the IDEA).

### III. *Attorneys Fees*

■ The IDEA provides that a court may award reasonable attorney's fees to the parents of a child with a disability who is the prevailing party. 20 U.S.C. § 1415(e)(4)(B); *Hunger v. Leininger*, 15 F.3d 664, 670 (7th Cir.), *cert. denied*, 513 U.S. 839, 115 S.Ct. 123, 130 L.Ed.2d 67 (1994). Those costs and attorneys fees may cover both the judicial and administrative proceedings. *Brown v. Griggsville Community Unit School Dist. No. 4*, 12 F.3d 681, 683 (7th Cir.1993). Any fee award must be based on "rates prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished." 20 U.S.C. § 1415(e)(4)(C). There is no doubt that the plaintiffs here are the "prevailing party." We consequently award plaintiffs all attorney fees from the two due process hearings and the present action in federal district court.

### IV. *Conclusion*

We grant plaintiffs' motion for summary judgment and order the district to comply with the Level I order as modified by the Level II decision, our memorandum and order of December 2, 1998, and our opinion today. This of course extends the period of services eligible for reimbursement back to April 21, 1997, the date of the IEP proposed by the school district and rejected by T.'s parents. It also covers the March training workshop and the

---

**18.** The district's third theory, that it was the state's "agreement" that created the obligation for reimbursement for the stay-put placement, is relevant only for disposition of the interim order.

educational materials purchased for T.'s program. It does not include the costs of the private preschool program or duplicative parent training programs. We deny the district's motions for summary judgment against the ISBE and against the parents. We grant plaintiffs' petition for attorney's fees in Case No. 98 C 4632 and extend the order to cover fees incurred while litigating Case No. 98 C 4633. Plaintiffs may submit an updated petition for fees and costs. With respect to all fees and costs sought, the parties shall comply with Local Rule 47.